Delwood C. COLLINS, Plaintiff,

v.

Manuel Marina MARTINEZ, personally, and in his official capacity as former Acting Chancellor of the Medical Sciences Campus of the University of Puerto Rico; the Conjugal Partnership of Manuel Marina Martíñez and "Jane Doe"; Matthew Kessler, personally and in his official capacity as Director of the Caribbean Primate Research Center; the Conjugal Partnership of Matthew Kessler and Ava Gaa; Carlos Torres Colondres, personally, and in his official capacity as Administrative Director of the Caribbean Primate Research Center; the Conjugal Partnership of Carlos Torres Colondres and "Jane Doe"; Dan C. Williams, personally, and in his official capacity as a Veterinarian at the Caribbean Primate Research Center; the Conjugal Partnership of Dan C. Williams and Maria Williams; Fernando Agrait, personally, and in his official capacity as President of the University of Puerto Rico; the Conjugal Partnership of Fernando Agrait and Laura González; Jose M. Saldaña, personally, and in his official capacity as Chancellor of the Medical Sciences Campus of the University of Puerto Rico; the Conjugal Partnership of José M. Saldaña and Delia Quilichini de Saldaña; Amalia Martíñez Pico, personally, and in her official capacity as Dean of Academic Affairs; Nectar Torregrosa, personally, and in her official capacity as former Interim Dean of Medicine;

The Conjugal Partnership of Néctar Torregrosa and "John Doe"; and, Nydia de Jesús, personally and her official capacity as Dean of Medicine at the Medical Sciences Campus of the University of Puerto Rico; the Conjugal Partnership of Nydia de Jesús and "John Doe"; the University of Puerto Rico, Defendants.

Civ. No. 89–1095 (JP).

United States District Court,

D. Puerto Rico.

March 20, 1989.

María H. Sandoval, Nachman & Fernandez–Sein, Santurce, P.R., for Delwood C. Collins.

Juan A. Moldes–Rodríguez, San Juan, P.R., for codefendant University of Puerto Rico Central Admin.

Ismael E. Marrero, Hato Rey, P.R., for codefendants Kessler, Williams and Torres.

Rubén T. Nigaglioni, Ledesma, Palou & Miranda, Hato Rey, P.R., for other codefendants.

## OPINION AND ORDER

PIERAS, District Judge.

The University of Puerto Rico maintains a colony of rhesus monkeys and other primates in Puerto Rico, in a facility known as the Caribbean Primate Research Center (CPRC). An administrative branch of the Medical Sciences Campus of the University, the CPRC uses its primates for medical research. In 1982, Dr. Delwood Collins, a man "of whom something was expected," [1] appeared upon the scene from Emory University in Atlanta, Georgia.

Following an initial time of mutual contentment among Dr. Collins and those in authority at the University, a new course presented itself and caused disappointment.[2] A timeworn drama began to unfold, in which shrewd men were led to strategy, rough coercion was employed, honest people became perplexed and appeared dishonest, and reprisals and accusations replaced collegiality and common effort. And in the inevitable movement onward, those most disappointed sought redress in the federal court.

Dr. Collins instituted this case to acquire compensation for several legal wrongs: 1) breach of an employment contract with the University, 2) violation of his right to due process of law before being deprived of his employment as a professor in the University's School of Medicine, 3) tortious interference by several colleagues with his contractual relationship with the University, and 4) defamation by Dr. Mathew Kessler, an employee of the CPRC and erstwhile friend and associate of Dr. Collins'. Dr. Kessler, as surely interested in vindication as Dr. Collins, complained of his own defamation at the hand and pen of Dr. Collins and accordingly filed a counterclaim. Earlier in the proceedings, the Court dismissed the breach of contract claim on the ground that it was barred by the Eleventh Amendment. After discovery and a stipulation waiving the parties' rights to a jury trial, evidence was taken in trial by the Court. After carefully reviewing the evidence, the Court enters the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. *The Arrival*

In May, 1982, Dr. Delwood Collins, the plaintiff, a research scientist and tenured professor employed at Emory University and at the Veterans Administration Hospital in Atlanta, Georgia, responded to an advertisement placed by the University of

---

**1.** *See* Thomas Hardy, *The Return of the Native,* at 170, (Easton Press, 1978).

**2.** *Id.* at 175.

Puerto Rico in Science Magazine.[3] After submitting an application for employment, a series of interviews ensued between Dr. Collins and the Chancellor of the Medical Sciences Campus, Dr. Norman Maldonado. As a result of these interviews and letters exchanged between Dr. Collins and Dr. Maldonado, Dr. Collins became employed on a part-time basis in late 1982 as Director of the CPRC.

### B. *Tidings of the Comer*

The first of the letters was written by Chancellor Maldonado and Pedro Santiago, Dean of Medicine, on October 18, 1982. This letter constituted an offer of employment as Director of the CPRC and as a faculty member in the School of Medicine and the Department of Biochemistry. Dr. Collins' response on November 12, 1982, was not an acceptance but an indication of continued interest and a fairly detailed elucidation of Dr. Collins' goals at the University and the conditions that he would require to be improved.

On December 30, 1982, Dr. Collins submitted an even more detailed recitation of conditions required for his acceptance. For example, Dr. Collins proposed that a Department of Comparative Medicine be created at the University of Puerto Rico's School of Medicine; that the department would be an academic unit; and that it would be headed by Dr. Collins, who would be appointed Department Chairman and who would also be appointed full professor with tenure at the School of Medicine. In addition, Dr. Collins would also be designated Director of the Caribbean Primate Research Center. New laboratories and offices would be built for the Department of Comparative Medicine; faculty and administrative positions would be created for Dr. Collins' staff; and a substantial budget would be allocated to the Department of Comparative Medicine.

Chancellor Maldonado responded to this letter on January 21, 1983, agreeing in principle with most of Dr. Collins' requested "clarifications" and renewing the offer of employment upon those modified terms. More letters were exchanged, but Dr. Collins never formally accepted the full-time position. Neither party ever expressed concern over the time that was passing without a formal agreement, however, and the letters in the record reflect an ongoing conversation between Collins and Maldonado of the development of CPRC and the Division of Comparative Medicine.

### C. *The People Make Ready*

Dr. Collins began work in 1983, without a full-time agreement, as acting director of the CPRC. He worked about 100 hours per month on projects related to the CPRC and the Division of Comparative Medicine, and he travelled to Puerto Rico on a monthly basis and remained there for approximately one week on each occasion. He was compensated through the means of Professional Service Contracts, at first in the amount of $791.66 per month.

Later, in August, 1984, his compensation was raised to $2,000.00 per month, and on August 14, 1984, the Administrative Board of the Medical Sciences Campus granted Dr. Collins tenure as professor in the School of Medicine.[4] *See* Plaintiff's Exhibit

---

3. *See,* Appendix to plaintiff's Exhibit 7. The University was interested in hiring a director to head the Caribbean Primate Research Center (CPRC), an administrative branch of the Medical Sciences Campus.

4. A good deal of testimony was presented at trial to establish whether the grant of tenure was legally accomplished. The record is clear that the Administrative Board granted tenure and that no further administrative steps were required by the University's regulations. *See* Article 50, General Regulations of the University of Puerto Rico, Defendant's Exhibit MM. This Court considers Certification Number 33 to be entitled to great weight and presumes that the Administrative Board acted according to its regulations. The only evidence presented to establish the invalidity of Certification Number 33 was a notice written by the Secretary of the Board saying that Dr. Collins' files did not contain an approval by the president or proof of Dr. Collins' tenure at Emory. No one testified from the Board. There was no direct evidence that the Board acted without the consent of the president and without proof of tenure. The evidence presented proves only what the secretary's files failed to contain on a particular date. Therefore the Court finds that Dr. Collins was granted tenure at the University beginning on August 14, 1984. There remains a question of

69, translated in Plaintiff's Exhibit 7 ("Certification 33"). From 1982 through 1985, Dr. Collins wrote numerous grant proposals, many of which were funded. He also recruited, with the University's permission, research scientists from the United States who relocated to Puerto Rico and commenced working in the Division of Comparative Medicine.

In 1983, the University began building a laboratory for use by Dr. Collins and members of the Division of Comparative Medicine. It was repeatedly delayed, first due to the fact that the initial contractor filed for bankruptcy, and later because laboratory equipment needed for completion had not been ordered or received.

By August, 1984, at least three faculty members had been recruited from the continental United States and had relocated to Puerto Rico. Seven faculty members had been given appointments in the Division of Comparative Medicine.

### D. *An Hour of Bliss ...*

On August 14, 1984, Dr. Collins was granted tenure as a professor in the Department of Biochemistry. He was given a joint appointment as professor of Biochemistry and as a researcher in the Division of Comparative Medicine. Defendants Matthew Kessler, Carlos Torres Colondres, and Dan Williams had accepted appointments within the Division of Comparative Medicine. Dr. Collins' joint appointments were apparently conditioned on Dr. Collins coming on board full time; however, his coming on board full time was in turn dependent on the completion of the laboratory that was under construction. The reason for this is that Dr. Collins' research could not be interrupted for a time longer than it took to move to San Juan. Deadlines and requirements, imposed by the institutions that funded his research, precluded him from discontinuing his research for any extended period. It was for this reason that Dr. Collins insisted that the laboratory be completed before relocating permanently in Puerto Rico.

### E. *... and Many Hours of Sadness*

Towards the end of 1984 and in the early part of 1985, Dr. Collins' relations with defendants Kessler, Torres, and Williams, which had at the start been positive, began to deteriorate. Correspondence introduced into evidence, as well as the testimony elicited at trial, indicates that these defendants became hostile, not only to the idea of the Division of Comparative Medicine, but towards Dr. Collins. Delays surrounding the laboratory became a point of contention between plaintiff and defendant Torres, who had been appointed by Dr. Collins to be the Administrator of the Division of Comparative Medicine. Mr. Torres was responsible for processing orders regarding laboratory equipment through the University's financial and budgetary subunits. As a result of these delays, the laboratory, which had commenced construction in 1983, was not completed until September of 1985.

During this same period, Dr. Collins continued to perform his duties in much the same ways that he had performed them in 1983 and in the early part of 1984. He continued to travel to the University on a monthly basis, remaining in Puerto Rico approximately one week on each occasion. He continued to dedicate at least 100 hours monthly to the performance of his duties, including the writing of grant proposals, the administration of the CPRC, and the establishment of the Division of Comparative Medicine. He also continued to represent the University at various scientific meetings and conferences.

During the same period, Dr. Maldonado attempted to shepherd the concept of the Division of Comparative Medicine through the appropriate bodies and entities of the University. The Division was eventually included in the Integral Plan of the Medical Sciences Campus, a document which was described as the "blueprint" for the campus' academic programs.

In March, 1985, the National Institutes of Health (NIH) announced that it would grant only $300,000 of the $550,000 that it had originally announced would be given to

the effective date of the tenure—immediately or when Dr. Collins became a full-time employee.

support the Division of Comparative Medicine. Faced with this information, Dr. Collins travelled to Washington on behalf of the University of Puerto Rico to persuade NIH officials to fund the Division of Comparative Medicine, which included the CPRC, at the rate originally promised. Dr. Collins explained that the $200,000 reduction in funding by NIH threatened to eliminate the research component that he and the University had worked to establish. NIH subsequently announced that it would grant the Division funding at the original amount of $550,000.

On June 30, 1985, Dr. Collins' last Professional Services Contract expired. The status of the Division of Comparative Medicine on that date was as follows: all faculty members, except for one, were in place; funding had been announced; and appointments by the Administrative Board of all members to the Division of Comparative Medicine had been made and announced. The laboratory necessary for conducting biochemical research, however, had not yet been completed. Dr. Collins had not permanently relocated himself, or his research, to Puerto Rico, but he expected to do so by August 1, 1985. At this point, the relationship between Dr. Collins and the University of Puerto Rico unravelled in earnest.

### F. *A New Force Disturbs the Current*

In 1984, the general elections in Puerto Rico created a change of parties in the office of the governor. Shortly thereafter, Dr. Maldonado departed as chancellor and Dr. Manuel Marina Martínez entered as interim chancellor. Dr. Marina's attitude toward the nascent Division of Comparative Medicine, the CPRC, and Dr. Collins' arrangements with the University appreciably differed from Mr. Maldonado's attitudes.

On July 5, 1985, Dr. Collins travelled to Puerto Rico to meet with Dr. Marina regarding the Division of Comparative Medicine. From July 5, 1985, to July 10, 1985, plaintiff met with Dr. Marina on three occasions. The purpose of these meetings was to determine if the new administration was interested in honoring the commitments made to Collins and to the Division of Comparative Medicine. On July 19, 1985, Dr. Collins wrote to Dr. Marina, apparently to address questions raised during these meetings. This letter requests certain commitments from Dr. Marina, answers questions that Collins anticipated would be asked of him by the University, and states that Collins would move to Puerto Rico full time as soon as the laboratory facilities and programs were in place. A National Institute of Health (NIH) grant was made contingent on Dr. Collins' relocation by August 1, 1985, and Collins communicated this target date to Dr. Marina.

### G. *The Custom of the Country*

When Dr. Marina was appointed as interim chancellor, he created an ad hoc committee to investigate and render a report on the creation of the Division of Comparative Medicine. The committee was composed of Dr. Amalia Martínez Pico, Mr. Manuel Martínez Maldonado, Laura Torres de Morales, Attorney Jaime Fuentes, and Attorney Joseph LoPresti. Dr. Collins was aware of this committee's existence, and his July 19 letter appears partly aimed to anticipate and respond to the committee's concerns. In particular, the letter addresses questions posed to Dr. Collins by Dr. Martínez Maldonado, including the "illegal" status of the Division and challenges to Dr. Collins' tenure.

On August 1, 1985, plaintiff travelled to Puerto Rico. Upon his arrival at the University, he was informed that the ad hoc committee had been appointed to evaluate whether the Division of Comparative Medicine should continue to exist. Approximately one hour after arriving on the Medical Sciences Campus, Dr. Collins was advised to appear before the committee. The committee was, among its other duties, authorized to investigate the grant of special tenure to Dr. Collins, but Collins was not notified of this fact.

Prior to his appearing before the committee, Dr. Collins was not informed of the identity of the other persons who had been invited to appear before the committee. He was also not advised as to what type of

information the committee intended to seek from him, nor was he requested to bring any particular documents.

Dr. Collins was interviewed for approximately thirty minutes, primarily by Dr. Martínez Maldonado, who indicated that he considered the Division of Comparative Medicine to have been illegally established. As Dr. Collins testified at trial, he was ill prepared to defend the establishment of the Division, since he had not been advised, prior to appearing before the committee, what information the committee was seeking to gather.

Dr. Collins met again with Dr. Marina sometime before August 3, 1985. Dr. Marina assured Dr. Collins that he would recommend to President Agrait that the Division of Comparative Medicine not be dismantled. He assured Dr. Collins that he would telephone him by Monday, August 4, 1985. He did not. Collins then tried to call Dr. Marina on August 5, 1985, without success.

On August 10, 1985, Dr. Collins received a letter dated August 7, 1985, which offered him continued employment at the University under the conditions recommended by the ad hoc committee; [5] that is, Dr. Collins would be director of the CPRC at a salary of $40,000 per year with an additional bonus of up to $10,000 per year to be paid from outside grants, no guarantee of tenure, no guarantees regarding the Division of Comparative Medicine, a reduction in budget, no further equipment purchases to replace Dr. Collins' Emory equipment, and promised attention to others of Dr. Collins' conditions. The letter included a five-day deadline, from receipt, to accept.

On August 11, 1985, Collins responded to Dr. Marina's letter of August 7th and declined the new offer. Dr. Collins explained that the offer of employment as then constituted would require him to violate the University's obligation vis-a-vis the National Institutes of Health (NIH). In a letter dated August 19, 1985, Dr. Marina responded to Dr. Collins' letter and characterized it as a "counter-offer" and requested that

plaintiff accept or reject the previous offer. Plaintiff did neither.

### H. *A Desperate Attempt at Persuasion*

On September 17, 1985, plaintiff wrote the Primate Advisory Committee, a standing committee at the Medical Sciences Campus which makes recommendations to the Chancellor and President regarding the activities of the CPRC. Dr. Collins attempted to obtain their support in reversing the decision made by the University to dismantle the Division of Comparative Medicine, but he was unsuccessful.

On August 20, 1985, one day after defendant Marina had requested of plaintiff that he either reject or accept the offer of employment made on August 7, 1988, the Chancellor's ad hoc committee issued its report. Among its findings, the committee acknowledged that Dr. Collins had been granted tenure by the Administrative Board, effective August 14, 1984. It also acknowledged that he had been granted "special tenure" pursuant to § 50.5.5.1 of the General Regulations of the University (1981):

> "The Administrative Board, at the request of the Rector and with the approval of the President of the University, can grant tenure after a probationary period of less than five (5) years, or without the probationary period requirement, to distinguished professors who are recruited from known universities where they are enjoying tenure ..."

Although Dr. Collins had previously presented documentation proving that he was a tenured professor at Emory University before coming to the University of Puerto Rico, the committee discounted the reliability of the documentation submitted by him and continued to question whether plaintiff, in fact, had tenure at Emory. Additionally, because no record of either President Almodovar's or President Agrait's approval were found in Collins' file, the committee recommended that the Administra-

---

**5.** Dr. Marina's August 7 letter follows the recommendations of the ad hoc committee precisely, although the committee's report was not officially submitted to Dr. Marina until August 20.

tive Board set aside its grant of tenure until President Agraít approved the grant and until Dr. Collins could submit satisfactory documentation regarding his grant of tenure at Emory University. Despite the committee's recommendation, the Administrative Board never set aside the grant of tenure.

Although the ad hoc committee described its work as being objective and impartial, the testimony of those persons who were requested to appear before the committee, including Dr. Collins, described the workings of the committee in quite a different way. Dr. Curt Busse and Dr. Dean Falk, who testified on behalf of the plaintiff, indicated that the nature of the questions presented to them suggested that the Chancellor's ad hoc committee had already made up its mind, before they entered the room, regarding the continued existence of the Division of Comparative Medicine, as well as the continued employment of Dr. Collins. Dr. Busse stated that questions presented to him were consistently rephrased in a highly suggestive manner that required him to advise the committee that he could continue to work at the University without Dr. Collins. Dr. Falk also testified that the committee asked her questions which clearly indicated that they were hostile to the concept of the Division of Comparative Medicine and were seeking to lay the groundwork for Dr. Collins' removal. The committee appeared to be looking for data to support a decision already made.

Although Dr. Collins requested to see the report completed by the Chancellor's ad hoc committee, he was denied the opportunity to do so and obtained a copy of this document only after filing suit. None of the information, therefore, contained in the report and which was circulated among members of the faculty, was made available to plaintiff at a time appropriate for him to refute or rebut the information contained therein.

## II. CONCLUSIONS OF LAW

### A. *Procedural Due Process*

Dr. Collins claims to have been deprived of his property, by several of the defendants, without due process of law and in violation of the federal constitution. In this Court's Order of January 14, 1988, Dr. Collins' due process allegations survived the defendants' motions to dismiss on the following basis:

Collins' final claim seems to be based on his failure to receive minimal process before his employment relationship was terminated. He claims damages in the amount of salary and benefits that were promised to him as well as $25,000.00 in punitive damages. The Court construes this as a claim against Manuel Marina in his individual capacity for unconstitutional actions taken under color of his authority as chancellor. This is not an action against the University, and thus not an action against the government of Puerto Rico.

The Court makes no determination at this stage of the litigation whether the plaintiff has a protectable property interest as a result of his grant of tenure; nor whether defendant Marina's actions violated his claimed right to due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 [105 S.Ct. 1487, 84 L.Ed.2d 494] (1985). We only decide that if the plaintiff is able to prove his allegations against Marina, the defendant is not protected by the eleventh amendment. Accordingly, the defendant's motion to dismiss for lack of jurisdiction under the eleventh amendment is DENIED.

The parties have not expressed any objection to this Order, and it guides the Court's analysis at this time.

Dr. Collins avers that he possessed a protected property interest through the grant of special tenure by the Administrative Board on August 14, 1984.[6] Certifica-

6. The Certificate reads as follows in translation: I, MILAGROS GARCIA, Secretary of the Administration Board of the Medical Sciences Campus of the University of Puerto Rico CERTIFY: That the Administrative Board, in its ordinary meeting held on the 14th of August, 1984, agreed to grant the following *TENURE* to become effective August 14, 1984: *School of Medicine* *Dr. Delwood C. Collins*—SS 256–54–1171

tion 33 specifies that Dr. Collins was granted tenure as full professor in the School of Medicine and that the effective date was August 14, 1984.[7] The defendants contest the validity of Dr. Collins' tenure at U.P.R. and insist that no property right existed.

As noted in footnote 4 above, the University's original two-part rationale for the nonexistence of Dr. Collins' tenure is nothing more than an invention ex post facto. That is, the Court concludes that Certification Number 33 constituted a complete and lawful grant of tenure.

■ At trial, a second argument reardging Dr. Collins' tenured status arose from the testimony of the former chancellor, Dr. Maldonado. Dr. Maldonado, on cross-examination, testified that Dr. Collins did not actually have tenure, but a promise of tenure, subject to his coming to Puerto Rico on a full-time basis. This raises the question of the effective date of Dr. Collins' property interest. As noted above, the Court assumes that the Administrative Board acted in accordance with the regulations. Therefore, the Court must determine whether University regulations permit the grant of tenure to a part-time professor, to be effective while that professor is working only part-time.[8]

Two of the University's regulations are relevant at this point. Section 50.3, titled "Who shall be granted tenure," states:

Tenure for faculty shall be granted to those persons with an appointment on probation working full time, filling regular posts in the working budget of the University or in that of any of its institutional units or subunits and, who are judged by the competent authorities to have rendered satisfactory service for a

period of five (5) years, all in accordance with the following sections.

The General Regulations also contain the special-tenure provisions in Section 50.5.5.1, titled "Autonomous institutional units," which states:

The Administrative Board, [at] the recommendation of the chancellor and with the approval of the university president, may grant tenure after a probationary period of less than five (5) years, or without the trial period requirement, to distinguished professors recruited from other accredited universities in which they have tenure. By the same token, it may grant tenure after a probationary period of less than five (5) years to persons of exceptional merit who have distinguished themselves in the practice of their professions. In these latter cases a probationary period of at least a year shall be required.

The purpose of Section 50.5.5.1 is to supplant at least some, and perhaps all, of the requirements of Section 50.3 in extraordinary cases to distinguished scholars. The Court held, above, that Dr. Collins satisfied the requirements of Section 50.5.5.1. The only question is whether any of the requirements of Section 50.3 had to be fulfilled as well. The Court concludes that they did not.

Section 50.5.5.1 clearly dispenses with the requirement of a probationary period because it permits tenure "after a probationary period of less than five years, or without the trial period requirement." Likewise, it dispenses with any "full-time" requirement because the words "working full time" in 50.3 modify only "appointment on probation," and do not stand as an independent requirement for the grant of ten-

---

Professor

In witness whereof I issue this Certification in Río Piedras, Puerto Rico, this 27th of August, 1984.

7. There is no question that tenure could not be granted to Dr. Collins in his position as Director of the CPRC. *See* General Regulation 50.5.4.1: Members of the faculty to whom administrative functions or additional tasks have been assigned such as ... department head, director of an institutional unit, ... and other

analogous administrative posts, shall not be granted tenure in the performance of such functions or additional tasks.

8. The Court engages in this inquiry only to determine the intent of the Administrative Board when it issued Certification 33. That Certification considered alone would show that the Board intended to grant tenure effective on August 14, 1986. The Court considers the regulations to decide whether that evidence is rebutted by those regulations.

ure.[9] The requirement that the faculty member fill a regular post in the working budget was not addressed at trial or in the documentary evidence, and it is not clear what effect it would have on Certification 33. The Court concludes, however, that this requirement should be considered as pre-empted along with the rest of Section 50.3. The special-tenure section clearly renders the full-time probation requirement and the five-year requirement meaningless. And the Court has been offered no reason why the "working budget" requirement should invalidate an otherwise acceptable grant of tenure under Section 50.5.5.1. The Court therefore reads Certification 33 as fully consistent with University regulations and a valid grant of full tenure, effective August 14, 1984. By virtue of this act by the University, Dr. Collins obtained a protectible property interest which the University could confiscate only after affording the plaintiff due process of law.[10] *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■ As a tenured professor in the state university, Dr. Collins was entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495. Chancellor Marina's Ad Hoc Committee to Evaluate the Division of Comparative Medicine, and its lengthy report, is the closest thing to a due-process forum presented to Dr. Collins.

The Committee's procedures did not, however, provide Dr. Collins with any of the elements of due process outlined in *Loudermill,* and the termination which resulted must be considered constitutionally infirm.

Dr. Collins received only abrupt notice before being summoned to a brief interview by the Committee. He was never advised what information the Committee sought or that his tenure was to be revoked. He was denied any further interviews with the Chancellor of the School of Medicine. Although Dr. Collins appears to have been aware of some instability in the University environment,[11] the defendants never actually gave him notice of the nature of the proceedings that would eventually result in the revocation of tenure. Without such notice, all the proceedings undertaken by Dr. Marina and his ad hoc committee were meaningless with respect to Dr. Collins' property right. Therefore, the Court concludes first that Dr. Collins' was deprived of his tenured position without due process of law, and second that Dr. Marina, as instigator of the ad hoc committee and author of the August 7, 1985, letter offering Dr. Collins a position without tenure, was directly responsible for this deprivation.

*B. Tortious Interference with Contract*

■ Dr. Collins alleges that several of his former colleagues in Puerto Rico—Dr. Matt Kessler, Attorney Carlos Torres Colondres, Dr. Dan Williams, and Dr. Marina—tortiously interfered with his contrac-

---

**9.** This is equally clear in the Spanish version: "La permanencia del personal docente se otorgará a las personas con nombramiento probatorio que desempeñen tarea completa, ..."

**10.** The Court would conclude that Dr. Collins possessed a protectable property interest even if it were to conclude that Certification 33 was not valid under Section 50.5.5.1. At a minimum, Certification 33 carried a promise of tenure to be fulfilled upon Dr. Collins' move to a full-time position in Puerto Rico. It thus created a reasonable expectation of continued employment. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Harris v. Arizona Bd. of Regents,* 528 F.Supp. 987 (D.C.Ariz.1981); *Soni v. Board of Trustees of the University of Tennessee,* 513 F.2d

347 (6th Cir.1975). The only obstacles to the perfection of Dr. Collins' tenure were placed and maintained by the defendants; that is, once the administrators of the University provided the laboratory facilities that the parties agreed were necessary, Dr. Collins would assume his full-time responsibilities and be entitled to tenure. Moreover, the granting of tenure in Certification 33 appears to have been bargained for by the parties and given to Dr. Collins in partial exchange for his continued efforts on behalf of the University. Under these circumstances, the Certification clearly was meant to establish an expectation of continued employment.

**11.** *See* Dr. Collins' letters of March 18, 1985, and June 19, 1985, to Dr. Maldonado and Marina, respectively.

tual relationship with the University. This claim is actionable under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141, pursuant to which the plaintiff must establish four elements: 1) the existence of a contract; 2) a tortious act by a defendant with knowledge of the contract's existence; 3) injury, and 4) proximate causation. *General Office Product Corp. v. A.M. Caperis Sons, Inc.*, 115 D.P.R. 553 (1984). Because the plaintiff has not shown a contract to have existed,[12] the Court must find in favor of the defendants regardless of the propriety of their actions.[13]

The correspondence exchanged between Dr. Collins and various University representatives is documented, above, and need not be reiterated here. The documentation and testimony clearly indicate that no offer was ever accepted by either party, with the exception of the Special Service Contracts which expired on June 30, 1985. The parties never reached the meeting of minds necessary to create a contract of full-time employment with a joint academic and administrative appointment. *See* Article 1213 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3391; Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. I, pp. 179–180. This was the agreement with which the defendants allegedly interfered; but because it lacked the formal requisites of a contract, no action lies in tort for interference.

## C. *Defamation*

■ As should be obvious at this point in the tale, relations between Dr. Collins and

his colleagues eventually resulted in darkened understanding and the exchange of sharp words. Both Dr. Collins and Kessler impelled anonymous letters of complaint to organizations that conducted oversight of their research. Dr. Kessler wrote to the Veteran's Administration to report unprofessional conduct by Dr. Collins, and Collins participated in a letter divulging an excessively high mortality rate at the CPRC to the National Institutes of Health.

Libel is actionable under the Code of Civil Procedure of Puerto Rico, 32 L.P.R.A. § 3141, *et seq.* Libel is defined as—

the malicious defamation of a person made public by writing, printing, sign, picture, representation, effigy, or other mechanical mode of publication tending to subject him to public hatred or contempt, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business, or in any other way to throw discredit, contempt or dishonor upon him ...

32 L.P.R.A. § 3142.

Although it appears that both doctors caused letters to be published that could have caused business injury, discredit, contempt, or dishonor to the other, neither has succeeded in proving defamation. The Court will only briefly explain: 1) neither doctor proved malice, 32 L.P.R.A. § 3142; 2) both doctors were beneficiaries of qualified privilege as public officers, 32 L.P.R.A. § 3144; 3) the substance of the communications was largely true—Dr. Collins report-

12. The primary importance of this first element is established in *General Office Products:* "In the first place, there must be a contract with which a third person interferes. If what is affected is an [expectation] or a profitable financial relationship where there is no contract, the action does not lie, although it is possible that liability be incurred under other judicial principles." *General Office Products,* 115 D.P.R. at 558, 559, official translation slip op. at 6.

13. The Court notes at this point that this holding should in no way be interpreted as indicating that the defendants' conduct was exemplary or even ethical. Attorney Carlos Torres, in particular, the administrative director of the CPRC, was shown to have conducted himself in a highly questionable manner. Accusations of Dr.

Collins' monetary irresponsibility—given to the ad hoc committee by Torres—were shown to be based on half-truths, irresponsible research, and gigantic leaps to foregone conclusions. Torres was continually and publically accused by Dr. Collins of deliberately delaying important projects, and Torres had every reason to fear for his job. Moreover, Torres' job was evidently the sort of plum worth fighting for: although he was supposedly a professional, he watched the clock carefully and at times maintained a legal practice during late afternoons and on his many vacation days. Torres, along with several other of the defendants, was shown to have ample motive and opportunity to interfere with the goals and programs of Dr. Collins.

ed mortality rates and Dr. Kessler reported errors in grant applications—and made to proper authorities, 32 L.P.R.A. 3144, *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734 (1975); and 4) neither doctor proved damages.

The Court therefore finds in favor of defendant Kessler on the plaintiff's complaint and in favor of plaintiff Collins on the defendant's counterclaim.

### D. *Damages*

 The Court has determined that the plaintiff, Dr. Collins, prevailed on his procedural due process claim, that the defendants have succeeded on all other claims, and that Dr. Collins prevailed as a defendant to the counterclaim. In relation to Dr. Collins' vigorous and persuasive prosecution of the merits of his case against Dr. Marina and the rest of the University authorities, his efforts to prove injury were curiously indifferent. He testified that he was depressed "quite a lot," and that his reputation had been damaged in the scientific community. Despite attempts by counsel to elicit testimony as to damages, *see, e.g.,* pp. 10–19, transcript, Second Day of Non-jury Trial, Dr. Collins did not indicate that he suffered financially or personally from the improper actions of Dr. Marina. In fact, the security Dr. Collins sought in maintaining his ties with Emory while working with U.P.R. served him quite well despite the ordeal in Puerto Rico. Although he was summarily terminated from his relationship with U.P.R., Dr. Collins does not claim to have lost a grant, an opportunity, or a paycheck. He does not claim to have suffered a reduced salary due to his remaining at Emory. He skillfully played his hand to avoid any losses in Georgia while beginning his investment in Puerto Rico. When his Puerto Rico interests collapsed—partly because of his split loyalties—he was protected. In this situation, the Court cannot find him entitled to compensation for any lost income or economic opportunities in Puerto Rico.

Pain and suffering is recoverable, but Dr. Collins did not prove the sort of injury that would justify a significant award. He called no experts or witnesses as to physical or emotional suffering. The Court finds that an award of $3,000.00 would adequately compensate Dr. Collins for his suffering due to his termination and his diminished stature in the scientific community. Finally, Dr. Collins failed to show the sort of oppression, malice, ill will, reckless disregard for his civil rights or other aggravating circumstance that would justify an imposition of punitive damages against Dr. Marina.

It should be clear that Dr. Collins is the prevailing party in this lawsuit, and that he has proved improper and unconstitutional actions by the University. In this sense he has been vindicated, and his reputation restored. His monetary recovery is not great, but it is commensurate with his misfortune and in large measure consistent with the result for which he pressed.[14]

Judgment shall be entered accordingly. IT IS SO ORDERED.

---

14. *See* Thomas Hardy, at 416: "But every where he was kindly received, for the story of his life

had become generally known. THE END."