Delwood C. COLLINS,
Plaintiff, Appellee,

v.

Manuel MARINA–MARTINEZ,
Defendant, Appellant.

No. 89–1448.

United States Court of Appeals,
First Circuit.

Heard Dec. 8, 1989.
Decided Jan. 24, 1990.

Nilda M. Navarro, with whom Ruben T. Nigaglioni and Ledesma, Palou & Miranda, Hato Rey, P.R., were on brief, for defendant, appellant.

Maria H. Sandoval, for plaintiff, appellee.

Before BREYER, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Alleging monkey business of a nonscientific sort, plaintiff-appellee Delwood C. Collins, quondam director of the Caribbean Primate Research Center (Center) at the University of Puerto Rico (U.P.R.), brought suit in federal district court against a coterie of defendants. Collins asserted a wide variety of claims (some under federal law, some not) stemming from his abrupt ouster as head of the Center. The case was tried to the bench. The court ruled that Collins, having been denied procedural due process, was entitled to redress against defendant-appellant Manuel Marina–Martinez (Marina) under 42 U.S.C. § 1983 (1982). *Collins v. Martinez*, 709 F.Supp. 311, 317–19 (D.P. R.1989). The court did not grant reinstatement or other equitable relief, but awarded Collins $3000 in compensatory damages.[1] *Id.* at 321. It found against plaintiff on his other statements of claim, *id.* at 319–21, and in his favor on a permissive counterclaim, *id.* at 320–21. Marina appeals. We affirm.

## I. AN OVERVIEW

The district court has set forth the pertinent facts with particularity and in a manner generally responsive to the record evidence, *id.* at 312–17, and it would be pleonastic to rehearse them *in extenso*. Rather, we refer the reader who may thirst for detail to the opinion below. For our purposes, it is enough to limn the nub of the controversy:

1. At the instance of Dr. Norman Maldonado, chancellor of the Medical Sciences Campus (MSC), plaintiff—a renowned researcher and full professor at Emory University—came to U.P.R. in 1983 as director of the Center and a faculty member at the

School of Medicine. He retained his Georgia connections, worked at U.P.R. on a part-time basis, and was paid under a series of professional service contracts. The parties envisioned that a Division of Comparative Medicine would eventually be created at the School and that Collins would chair the division. For a variety of reasons, the plan never came fully to fruition.

2. In March 1983, the MSC's Administrative Board (Board) issued 1982–83 Certificate No. 114 to plaintiff, granting him academic rank as a full professor of biochemistry at the School of Medicine. *See* Appendix A (English translation).

3. On June 11, 1984, anticipating start-up of the Division of Comparative Medicine, Collins wrote to the dean of the School of Medicine, requesting *inter alia* that he be granted tenure as a professor of biochemistry and comparative medicine. Maldonado formed the division that summer and Collins, still working parttime, undertook plenary supervision of it. In an apparent response to this event and to Collins' June 11 letter, the Board granted him tenure as of August 14 by means of 1984–85 Certificate No. 33. *See* Appendix B (English translation).

4. In the November 1984 general election, Puerto Rico's voters ousted the party in power. Shortly after the new government took office, the winds of change wafted to U.P.R. Among other things, Marina replaced Maldonado as chancellor on July 1, 1985. Collins' last professional services contract expired at about the same time. Although he continued to work at U.P.R. for a spell, his contract was not further renewed.

5. Marina created an ad hoc committee (Committee) to investigate the feasibility of the Division of Comparative Medicine. Within a matter of weeks, the Committee debunked the division and questioned the validity of Collins' tenure.[2]

1. It is undisputed that Dr. Marina, who became interim chancellor of the university's Medical Sciences Campus on July 1, 1985, was the prime mover in Dr. Collins' ouster. The damage award ran against Marina individually, "for unconstitutional actions taken under color of his

authority as chancellor." *Collins*, 709 F.Supp. at 317.

2. The Committee never concluded outright that Collins lacked tenure. Instead, it recognized "that tenure has been granted to [Collins] since

6. Marina welcomed the Committee's recommendations, disbanded the division, asserted that Collins did not have tenure and offered him transient full-time employment on unpalatable terms. When plaintiff did not accept defendant's offer, he was, in the district court's phrase, "summarily terminated from his relationship with U.P.R." *Collins*, 709 F.Supp. at 321.

## II. THE ISSUE

The only question properly before us is whether the district court erred in finding that Marina should respond in damages for violating rights constitutionally assured to Collins. The question has two principal parts: (1) Did plaintiff possess an interest in his employment at U.P.R. which deserved the prophylaxis of procedural due process? (2) If so, did Marina's actions transgress due process? Unless both of these sub-queries are answered in the affirmative, the judgment below is unsupportable.

█ The two-part question has a further gloss. In a federal civil rights suit, a government official is entitled to qualified immunity for discretionary acts undertaken within the scope of his authority. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In determining the applicability of such immunity, we focus on the "objective legal reasonableness" of an official's conduct to ascertain whether the conduct infracted clearly established constitutional rights. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738. As we have said before:

> In this context, the phrase "clearly established" has a precise definition: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Domegan v. Fair*, 859 F.2d 1059, 1063 (1st Cir.1988) (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039).

In this case, Marina raises the qualified immunity defense as to both prongs of the bifurcated question. He contends that, at the very least, it was not "clearly established" that Collins had a constitutionally protected property interest in his tenure at U.P.R. Marina also contends that his handling of Collins' situation was not unreasonable. Because these assertions (and hence, the entire issue of qualified immunity) are imbricated with the merits and the district court's factfinding in respect thereto, we discuss this special defense in connection with our discussion of the merits. *See Unwin v. Campbell*, 863 F.2d 124, 136–37 (1st Cir.1988) (declining to grant Rule 56 motion raising qualified immunity defense because factual disputes existed); *Domegan*, 859 F.2d at 1064–65 (similar).

## III. WHETHER PROCESS WAS DUE

### A. *The Nature of Plaintiff's Interest.*

█ It is crystal clear that plaintiff's entitlement to procedural due process hinges, in the first instance, on whether he had a property interest in his tenured status at U.P.R. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). Such property rights as Collins possessed arose under Puerto Rico law, not by virtue of the federal Constitution. That is to say, "[t]he sufficiency of a claim of entitlement to a property interest in public employment must be measured by, and decided with reference to, local law." *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 319 (1st Cir.1989) (en banc).

█ The district court, applying this yardstick, found specifically that, by virtue

---

August 14, 1984" and specifically disclaimed any "intention to question Dr. Collins' qualifications." The Committee suggested, however, that defendant ask the Board to "set aside Certification Number 33, 1984–85 Series, until the approval of the President of the University of Puerto Rico and the tenure of Doctor Collins at

Emory University are clarified." Marina made no such request to the Board but seized upon this suggestion as the basis for claiming that plaintiff was untenured, telling plaintiff that his tenure required "official evaluation and approval."

of the tenure grant, "Dr. Collins obtained a protectible property interest which the University could confiscate only after affording [him] due process of law." *Collins*, 709 F.Supp. at 319. Appellant demurs. He claims that Collins, as a part-time administrator,[3] did not qualify for tenure under U.P.R.'s rules, and thus, could not have received it. We have set out the pertinent portions of U.P.R.'s general regulations relating to faculty tenure (Regulations) in Appendix C. The district court reviewed the Regulations and found that, although plaintiff was not eligible to receive "regular" tenure under section 50.3 (he had not "work[ed] full time ... for a period of five (5) years" at U.P.R.), he was eligible to receive—and did in fact receive—"special" tenure under section 50.5.5.1. *Collins*, 709 F.Supp. at 318–19. Defendant attacks the finding on both legal and factual fronts. Neither sortie is effective.

As a legal matter, the district court's construction of section 50.5.5.1 as dispensing with any requirement that the recipient of special tenure be employed full time, *Collins*, 709 F.Supp. at 318–19, is unimpugnable. For one thing, it comports with the plain language of the regulation. For another thing, since special tenure can, by the terms of section 50.5.5.1, be granted without any probationary or trial period *at all*, it is difficult to fathom how the sort of historical full-time requirement applicable to regular tenure, *see* Regulations, § 50.3, might attach.

As a factual matter, the district court's finding that special tenure was duly conferred on Collins must also be sustained. Appellant contends that, to be effective, the grant of tenure required both (a) proof of Collins' tenured status at Emory University, and (b) approval by the president of U.P.R. But, the district court found that these requirements were fulfilled and labelled appellant's contrary contention "nothing more than an invention ex post facto." *Collins*, 709 F.Supp. at 318; *see also id.* at 313 n. 4; *cf. Loudermill*, 470 U.S. at 539 n. 5, 105 S.Ct. at 2704 n. 5 (employer "cannot escape its constitutional obligations by rephrasing the basis for termination as a reason why [plaintiff] should not have been hired in the first place"). At any rate, there was adequate proof that the requirements were satisfied.

As to the first, Collins testified, without contradiction, that in his "original submission for tenure in 1984," he furnished the Board proper documentation verifying his tenure at Emory.[4] Perhaps more to the point, the defendant is not contesting the fact that plaintiff enjoyed tenure at Emory all along—indeed, Marina stipulated in the pretrial order that Collins, at the relevant times, was "a full professor *with tenure* at Emory University" (emphasis supplied)—but is merely quibbling about the whereabouts of a piece of paper.

Similarly, the lower court's finding that the president had approved Collins' special tenure seems a fair inference from the totality of the evidence. What appellant's argument boils down to is the lack of proof of *written* presidential approval—but the Regulations speak only to "approval" and are silent as to form. Fairly read, section 50.5.5.1 neither necessitates nor suggests that the president's acquiescence be in writing. The Board's issuance of Certificate No. 33 presupposes (and thus, strongly implies) that the requisite formalities were complied with; there was no proof to the contrary; and there is no evidentiary predicate to support the idea that the then-

---

3. The second half of the characterization is belied by the record. There was ample evidence that Collins performed academic as well as administrative duties during his sojourn at U.P.R. Moreover, the tenure which he obtained was as a professor of biochemistry, not as director of the Center.

4. Although the district court was accurate in pointing out that no Board member came forward to rebut plaintiff's testimony on this point, the court misspoke when it wrote that "[n]o one

testified from the Board." *Collins*, 709 F.Supp. at 313 n. 4. In fact, Maldonado was the Board's chair when Certificate No. 33 was issued. The *lapsus linguae* is, we think, inconsequential; Maldonado never suggested that proof of plaintiff's tenure at Emory was not contemporaneously submitted. Moreover, the district court's opinion, which refers again and again to Maldonado's actions, and explicitly to his testimony, *e.g., id.* at 318, leaves no doubt but that Maldonado's testimony was fully considered.

president, Dr. Almodovar, opposed (or neglected to approve) tenure for Collins. Defendant's position relies solely upon surmise engendered by the inability of a new (and hostile) administration to locate a *written* record a year after the fact. The judge chose to reject such speculation in favor of a different, more cogent inference. It was not clear error for him to do so.

In sum, the district court found, supportably, that Collins qualified for, and duly received, special tenure. This finding, in turn, dictated the nature of plaintiff's interest.[5] It is axiomatic that a tenured academic at a public institution of higher education has property rights which cannot be eviscerated without due process of law. *See Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Roth,* 408 U.S. at 576–77, 92 S.Ct. at 2708–09; *Newman v. Massachusetts,* 884 F.2d 19, 23 (1st Cir.1989); *see also* P.R.Laws Ann. tit. 18, § 613(c) ("No member of the University personnel whose appointment is of a permanent character may be removed without the previous preferment of charges and an opportunity to defend himself.").

### B. *Qualified Immunity.*

■ Although Collins possessed a constitutionally protected property interest in his status at U.P.R., our inquiry remains open. Because qualified immunity does not address the substantive viability of a section 1983 claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity. *See, e.g., Brennan v. Hendrigan,* 888 F.2d 189, 194 (1st Cir.1989); *Newman,* 884 F.2d at 26.

We, therefore, proceed to consider Marina's affirmative defense.[6]

We begin with bedrock. "It is without question that . . . a tenured professor who faced the possibility of dismissal . . . was entitled to the protections of procedural due process, and that this due process right was clearly established [in 1984]." *Newman,* 884 F.2d at 23. Defendant concedes as much, arguing instead that an objectively reasonable university official in his position would not have thought that Collins, a part-timer, had tenure. To quote Marina, Collins seemed to have merely a "promise of tenure" unless and until he came on board full time. Accordingly, Collins' entitlement was not "clearly established."

We think the assessment is arguable—but beside the point. In a very real sense, it begs the question. Assuming *arguendo* that Marina's belief was objectively reasonable—a shaky assumption considering the district court's findings, the explicit language of Certificate No. 33, and Collins' testimony "that the granting of tenure had [no]thing to do with" commencement of fulltime employment—plaintiff nevertheless had a protectible property interest. Whatever skepticism Marina harbored, skepticism is not vanishing cream: Certificate No. 33, bestowing tenure on Collins "effective August 14, 1984," was unsullied, unrevoked, and a part of U.P.R.'s official records. If an objectively reasonable chancellor believed that Collins was not fully tenured, it could not have been because of a "retrospective fiction" concerning qualifications, *see Loudermill,* 470 U.S. at 539 n. 5, 105 S.Ct. at 1492 n. 5; such a doubt could legitimately have stemmed only from a belief that Collins was provisionally ten-

---

**5.** This case is markedly different from cases like *Rosario–Torres,* 889 F.2d at 319–20, and *Kauffman v. Puerto Rico Telephone Co.,* 841 F.2d 1169, 1173–75 (1st Cir.1988). There, we said "that under Puerto Rico law any property right associated with a career position is rendered null and void if a violation of the Personnel Act attends the filling of such a position." *Rosario–Torres,* 889 F.2d at 319 (quoting *Kauffman,* 841 F.2d at 1173). In those cases, it was uncontested that the plaintiffs had been hired illegally. Here, the opposite was proven true: the district court found, supportably, that plaintiff got ten-

ure in accordance with the applicable regulation.

**6.** Appellant elected to brief this issue largely in terms of his subjective good faith, citing almost exclusively to pre–1982 caselaw. We quickly place such ruminations to one side. The Supreme Court's decision in *Harlow* effectively eliminates from the qualified immunity calculus consideration of a government actor's subjective state of mind. *See Floyd v. Farrell,* 765 F.2d 1, 4 (1st Cir.1985).

ured, that is, what was "effective August 14, 1984" was a kind of tenure subject to forfeiture upon the occurrence of a condition subsequent (failure to accept a full workload at U.P.R. when offered). This is the very best we can do for Marina—to imagine that he might reasonably have seen Collins' tenure as subject to some kind of "condition subsequent." Even to make so heroic an assumption, however, profits Marina naught, for "conditional tenure" of this sort would nonetheless constitute a cognizable property intent under Commonwealth law.

The civil code states: "Every obligation, containing a condition subsequent, shall ... be demandable without prejudice to the effect of performance." P.R.Laws Ann. tit. 31, § 3041. That is to say, Puerto Rico law was clear, long before 1985, that an obligation subject to a condition subsequent possessed legal force from the moment there was a meeting of the minds between the contracting parties; and thereafter, the obligation existed, albeit subject to defeasance, as if the condition had never been stipulated. *See Amezaga v. Agudo,* 67 P.R.R. 6 (1947); *see also Font v. Registrar of Property,* 10 P.R.R. 383 (1906) (presence of condition subsequent does not relieve necessity of compliance with underlying obligation). Nor was this an atypical rule. *See, e.g., Mora v. Mora,* 429 S.W.2d 660, 662 (Tex.Civ.App.1968) (rights subject to conditions subsequent are legitimate property interests, not mere expectancies); *Reich v. Spiegel,* 208 Misc. 225, 140 N.Y. S.2d 722, 730 (N.Y.Sup.Ct.1955) (recognizing property right in defeasible interest); *cf. Estate of Schley v. Schley,* 100 Cal. App.3d 161, 161 Cal.Rptr. 104, 107 (1979) (inheritance tax applies to rights subject to condition subsequent as if condition had already been fulfilled). It is evident from these authorities that, even if Collins' appointment was subject to fulfillment of a condition subsequent as claimed by Marina, it nevertheless, under settled legal tenets, conferred a property interest on Collins— and an objectively reasonable administrator would have known as much.

In the usual case, a state actor may be relieved from liability because what is real-

ly a fish is not "clearly established" as such and reasonably appears to him to be a fowl. But here, no relief is obtainable: whether an objectively reasonable chancellor would have believed plaintiff's interest to be fish or fowl—whether the discernible facts would have suggested to him that plaintiff had achieved tenure irrevocably or provisionally—the law unambiguously proscribed stripping plaintiff's tenure without engaging the gears of procedural due process. On either version, then, "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand" that a denial of so elementary a safeguard offended the Constitution. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

This conclusion is buttressed in at least two additional ways. First, *all* grants of tenure are, in reality, subject to termination for cause, which makes them, in a sense, subject to certain conditions subsequent—one of which, typically, is the holder's obligation to carry a certain teaching load. It can scarcely be doubted that when a college proposes to dismiss a tenured professor for a supposed failure to perform his instructional duties, the professor is entitled to due process. We think that such a condition is analogous to the condition which appellant contends was attached to Collins' tenure grant (that he make himself available to work full time), and that the same degree of protection should inure in either case.

Second, we have held that even where a university has "an implied right of *bona fide* unavoidable termination of the contracts of tenured members of the faculty on the ground of change of academic program," *Jimenez v. Almodovar,* 650 F.2d 363, 369 (1st Cir.1981), the law requires that procedural due process be extended prior to separation. *Id.* at 369–70. Where, as here, the reason for termination is personal rather than systemic—that is, related to some shortcoming of the docent (unavailability) as opposed to an institutional necessity (programmatic needs)—the case for due process would seem more, not less, compelling.

In a nutshell, U.P.R.'s grant of tenure to Collins created a constitutionally protected property interest and an objectively reasonable administrator would have realized it.

## IV. WHAT PROCESS WAS DUE

■ The court below found that Marina deprived Collins of procedural due process by failing to give him adequate notice of, and a concinnous opportunity to be heard at, "the proceedings that would eventually result in the revocation of [his] tenure." *Collins*, 709 F.Supp. at 319. Inasmuch as these findings are reviewable only for clear error, *see* Fed.R.Civ.P. 52(a), we are "not at liberty to prepare a palimpsest." *Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1019 (1st Cir.1988). Rather, "[t]he district judge's findings can be short-circuited only if, on the evidence as a whole, we are 'left with the definite and firm conviction that a mistake has been committed.' " *RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 203 (1st Cir.1987) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). We see no clear error here.

Since Collins had a protectible property interest in his tenured status at U.P.R., the follow-on constitutional question became what process was due him. Precedent teaches that plaintiff was entitled to "some kind of a hearing" before he was divested of his tenure. *See Roth*, 408 U.S. at 569–70, 92 S.Ct. at 2705. The right to be heard contemplates adequate notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). This means, ordinarily, that a tenured employee is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495; *see also Kercado–Melendez v. Aponte–Roque*, 829 F.2d 255, 263 (1st Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988).

In this case, the record fully supports the finding that Collins did not receive the process that was due. Defendant claims that a hearing was held; he says that plaintiff met with the Committee and that he (defendant) disregarded plaintiff's tenure based on the Committee's conclusions[7]. Yet, the Committee never said that plaintiff's claim to tenure was bogus. *See supra* note 2. More important still, given plaintiff's (largely uncontradicted) testimony, the district court could warrantably have found the "hearing" before the Committee to be constitutionally infirm.

In this wise, the evidence suggests that, through the end of July 1985, plaintiff had no reason to believe his tenure was being questioned. On August 1, he arrived on campus and was told by Marina that the Committee was in session. He was led to believe that the Committee's job was merely to gather information to help the new chancellor "understand the purpose of the Comparative Medicine Division." He was not informed that the Committee was authorized to investigate the matter of his tenure. Collins testified that, within the hour, "I found myself before this committee." He had no prior inkling of what type of information would be requested of him. No specification of charges was furnished. He had no documents available to him. His interview lasted for 30 minutes. He was not given a chance to appear again. The ax fell six days later. The university's "evidence" against Collins was not season-

---

7. Marina also professed reliance on a memorandum dated July 18, 1985, authored by his in-house counsel, Joseph LoPresti. The memorandum is in Spanish. Appellant neither furnished us with a translation nor included it in the record appendix. While we could therefore ignore the document entirely, we have translated and considered it. The memorandum, like the Committee's report, questions the whereabouts of certain records. It does not state that Collins' tenure was invalid. LoPresti's only recommendation was that appellant "evaluate this case on its merits." There is no indication (1) that LoPresti's opinions were shared with plaintiff, or (2) that plaintiff knew of the memo, or (3) that plaintiff was accorded a chance to address LoPresti's concerns. In sum, the memorandum adds nothing of consequence to the case.

ably disclosed to him; indeed, he never saw the Committee's report until after he started suit.

The ways of due process are almost infinitely variable, but the common denominator is that the requisite hearing be granted "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Here, notice of the hearing was so abrupt and uninformative as to be constitutionally deficient. *See, e.g., Bignall v. North Idaho College*, 538 F.2d 243, 247 (9th Cir.1976) ("purpose of notice is to allow a complainant to marshall a case against the firing body"); *cf.* Regulations, § 50.8 (requiring six months prior notice to terminate provisional appointments at U.P.R. after first service year). Absent suitable notice, the "opportunity" for plaintiff to be heard was a charade. *See, e.g., Gorman v. University of Rhode Island*, 837 F.2d 7, 13 (1st Cir.1988) (to be fair in the due process sense, the hearing requirement "implies that the person adversely affected was afforded the opportunity to respond, explain, and defend"); *Davis v. Alabama State Univ.*, 613 F.Supp. 134, 138 (M.D.Ala.1985) (similar). Because Collins was afforded no real chance "to present his side of the case," *Loudermill*, 470 U.S. at 543, 105 S.Ct. at 1494, the lower court's conclusion that appellant overrode the niceties of procedural due process is rock solid.[8]

Nor is qualified immunity a defense on this aspect of the case. Subjective good faith cannot carry the day. *See supra* note 6. The basic requirements of due process have long been settled, and *Loudermill*—agreed by both parties to be the leading case on procedural due process in the context of tenured public employment—was decided some months before Marina took office. In August 1985, an objectively reasonable official would indubitably have known that depriving plaintiff of adequate notice and a meaningful opportunity to respond and explain concerning his tenure status violated the fourteenth amendment.

## V. CONCLUSION

To recapitulate, we hold that plaintiff had a cognizable property interest in his claimed tenure and, therefore, had the right to fair notice and a constitutionally adequate hearing before it was set aside. Defendant did not accord him that right and, because qualified immunity is not a bar on these facts, defendant, in his individual capacity, may be held answerable in money damages.[9]

We need go no further. As postured, the case does not present the question of whether plaintiff was entitled to retain tenure at U.P.R. and we express no view thereon.

*Affirmed.*

---

**8.** The district court also questioned the Committee's bias, (and, impliedly, appellant's motive in selecting its membership), reviewing certain testimony and observing pointedly that "[t]he committee appeared to be looking for data to support a decision already made." *Collins*, 709 F.Supp. at 317. The court did not, however, rest on these findings in determining that procedural due process was withheld. *See id.* at 319. We likewise eschew any such reliance. *See Acosta–Sepulveda v. Hernandez–Purcell*, 889 F.2d 9, 12 (1st Cir.1989) ("impartial decisionmaker" not a required part of minimally acceptable procedural due process owed to tenured public employees).

**9.** In his statement of issues on appeal, Marina lists an additional bone of contention: "Wheth-

er the District Court erred in assessing $3,000.00 in damages ... against Chancellor Marina." No explanation of the point was offered and the argument section of appellant's brief ignores the reference. It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *See, e.g., Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 353 (1st Cir.1989); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.1988). Any question as to the amount of the award is, therefore, foreclosed.

482

## APPENDIX A

IDAD DE PUERTO RICO, RECINTO DE CIENCIAS MEDICAS     G.P.O. BOX 5067 SAN JUAN, PUERTO RICO 00936—TEL. 767-

SECRETARIA, JUNTA ADMINISTRATIVA

1982 - 83
Certification Number 114

I, MILAGROS GARCIA, Secretary of the Administrative Board of the Medical Sciences Campus of the University of Puerto Rico, DO HEREBY CERTIFY:

That the Administrative Board granted the academic rank of Professor in the Department of Biochemistry and Nutrition of the School of Medicine, to doctor Delwood C. Collins, effective February 15, 1983.

Issued under the seal of the Medical Sciences Campus of the University of Puerto Rico, at Río Piedras, Puerto Rico, this fourteen day of March 1983.

Milagros García
Secretary

Approved

Norman Maldonado, M. D.
Chancellor

UNIVERSITY OF PUERTO RICO [LOGO]
G.P.O. BOX SAN JUAN, P.R. 00936

SECRETARY,
ADMINISTRATIVE BOARD

1984–85
Certification Number 33

I MILAGROS GARCIA, Secretary of the Administrative Board of the Medical Sciences Campus of the University of Puerto Rico, CERTIFY:

That the Administrative Board, in its ordinary meeting held on August 14, 1984, agreed to grant the following *TENURE*, to be effective August 14, 1984:

School of Medicine

Dr. Delwood Collins     SS 256–54–1171
Professor

And in witness thereof, I issue this Certification in Rio Piedras, Puerto Rico, today, August 27, 1984.

Milagros Garcia
Secretary

Approved:

Norman Maldonado, M.D.

Chancellor

MG/mjf

[Stamp]

## ARTICLE 50—TENURE FOR FACULTY

### Section 50.1—Functions of the Administrative Board.

After making the required evaluation, the Administrative Board of the corresponding unit shall, at the proposal of the chancellor, grant or deny tenure.

### Section 50.1.1—Notification of the granting or denial of tenure.

The Administrative Board shall notify the member of the faculty, in writing, of its decision to grant or deny tenure.

### Section 50.2—Function of the president.

In the case of the university colleges under his administrative jurisdiction, the president shall grant tenure, at the proposal of the director and the Collegiate Board.

### Section 50.2.1—Notification of the granting of tenure.

The President shall notify the employee, in writing of his decision to grant tenure.

### Section 50.2.2—Notification of denial of tenure.

The Collegiate Board of the university college in question shall notify the employee of the denial of tenure.

### Section 50.3—Who shall be granted tenure.

Tenure for faculty shall be granted to those persons with an appointment on probation working full time, filling regular posts in the working budget of the University or in that of any of its institutional units or subunits and, who are judged by the competent authorities to have rendered satisfactory service for a period of five (5) years, all in accordance with the following sections:

### Section 50.4—Conditioned tenure.

The Medical Sciences Campus and the Center for Energy and Environmental Studies shall grant conditioned tenure to personnel with special appointments funded with non-university resources, when these resources have a reasonable probability of being available for more than three (3) years. Conditioned tenure shall be granted under the same norms governing that granted to personnel whose appointment is charged to university funds.

### Section 50.5—Required service period.

### Section 50.5.1—Consecutive service.

The required years of service must be rendered consecutively in one of the faculty categories indicated in Article 45.

### Section 50.5.1.1—Exception to the requirement of consecutive years.

The requirement that the years of service be consecutive shall not apply in cases of interruptions for some type of leave or economic assistance for graduate study approved by the institution.

### Section 50.5.2—Services rendered while under temporary, substitute or special appointments.

Tenure shall not be granted to teaching personnel performing their functions under substitute, temporary or special appointments, but time served under those conditions, if rendered full-time and rated satisfactory after the corresponding evaluation, may be credited toward the required probationary period for the purpose of granting tenure.

### Section 50.5.3—Periods not to be counted.

In calculating the years required to receive tenure, time for periods of part-time services, services rendered by virtue of contract, as visiting lecturer, or analogous cases, shall not be credited. Neither shall time be credited for any leave period, except ordinary leave, accumulated sick leave or maternity leave.

### Section 50.5.4—Time in administrative functions.

Members of the faculty with appointments on probation, assigned to such functions as president of the University, director of an institutional unit, head of a division, head of an administrative department, assistant to an executive officer and other analogous posts, shall receive credit for the time spent performing those functions or tasks, up to a maximum of two years, when computing the required years to receive tenure in their regular teaching posts, according to the principles established in Article 70.

### Section 50.5.4.1—Faculty shall not be granted tenure in administrative functions or additional tasks.

Members of the faculty to whom administrative functions or additional tasks have been assigned such as president of the University, chancellor, dean, department head, director of an institutional unit, division head, assistant to an executive officer and other analogous administrative posts, shall not be granted tenure in the performance of such functions and additional tasks.

### Section 50.5.5—Total or partial exemption from the probationary period.

### Section 50.5.5.1—Autonomous institutional units.

The Administrative Board, as the recommendation of the chancellor and with the approval of the university president may grant tenure after a probationary period of less than five (5) years, or without the trial period requirement, to distinguished professors recruited from other accredited universities in which they have tenure. By the same token, it may grant tenure after a probationary period of less than five (5) years to persons of exceptional merit who have distinguished themselves in the practice of their professions. In these latter cases a probationary period of at least a year shall be required.

### Section 50.5.5.2—University Colleges of Cayey and Humacao.

In the University Colleges of Cayey and Humacao, the authority to exempt a person totally or partially from the probationary period requirement in the presence of the conditions mentioned in the previous section shall belong to the president, who shall act at the recommendation of the director of the college and take into consideration the recommendation of the Collegiate Board.

### Section 50.6—Tenure within the System.

Tenure rights guaranteed by these Regulations shall be institutional in character, effective throughout University System, regardless of the appointing authority which grants them.

### Section 50.7—Termination of appointments on probation without granting tenure.

The chancellor, in the case of autonomous institutional units, or the president, in the case of the Cayey and Humacao University Colleges, may terminate an appointment on probation without granting tenure, when so justified by the evaluation or evaluations made, by notifying the person concerned in writing.

## Section 50.8—Period for prior notification.

If the decision not to renew the appointment occurs during the first year of service under provisional appointment, the notification shall be made at least sixty (60) days prior to the date of termination. If the decision not to renew the provisional appointment occurs after the start of the second year of service, or in a subsequent year, the notification shall be made six (6) months in advance.

## Section 50.8.1—Procedure when the period for prior notification is not complied with.

When the notification of termination of services is made on shorter notice than that established in the previous section, the University shall pay as indemnization an amount equivalent to the gross salary of the person for the balance of the advance notice period, or until the person starts a new, remunerated activity, whichever occurs first. The person may choose to receive payment on a monthly basis or in a single final payment. To have the right to receive the monthly payment, or to receive a single, final payment at the end of the period, the person must submit a sworn statement indicating that he or she has not begun any new, remunerated activity, or if he or she has done so, indicating the starting date so that the payment due can be calculated.

## Section 50.8.2—Right to examine the record.

Whenever an appointment on probation is terminated, the personnel member concerned shall have the right to examine his or her record.

## Section 50.8.3—Right to request a review.

Upon notification of the termination of his or her provisional appointment without receiving tenure, the person concerned may, within thirty (30) days after the date of notification, request through the corresponding channels a review of the case. Unless the reviewing authority determines otherwise, the action terminating the appointment shall remain in effect while the review is in process.

## Section 50.9—Termination of other non-permanent appointments before their regular expiration date.

In addition to the provisions in Section 50.7 regarding provisional appointments, the appointing authority may terminate any non-permanent appointment before its regular expiration date for just cause and with prior written notification at least thirty (30) days in advance. The person concerned shall have the right to examine his or her record and the right to a review of the case, as stipulated in Sections 50.8.2 and 50.8.3.