**Jorge CRUZ, Plaintiff,**

v.

**Norberto MOLINA, Defendant.**

**Civ. No. 89–432 (PG).**

United States District Court, D. Puerto Rico.

March 27, 1992.

Raul Barrera Morales, Santurce, P.R., for plaintiff.

Iván Duarte Sierra, Aida Tolentino Medina, Bayamón, P.R., for defendant.

---

1. District of Maine, sitting by designation in the District of Puerto Rico.

2. Under Puerto Rican law, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. § 3471. The

OPINION

GENE CARTER, Chief Judge.[1]

In this diversity action brought under Puerto Rican law, Plaintiff seeks recovery for damages allegedly caused by Defendant's breach of a lease agreement and by Defendant's negligence with regard to Plaintiff's belongings. Defendant has counterclaimed seeking recovery for breach of contract, damage to the property, attorney's fees, and slander. Both parties have claimed damages for mental distress. The Court conducted a bench trial on February 3–5, 1992. The Court finds the following facts.

On October 8, 1987, Plaintiff and Defendant entered into a lease agreement under which Plaintiff would rent Defendant's house in the Canovanillas ward of Carolina. Defendant was a resident of New York. The lease agreement was evidenced in part by a written document submitted in evidence as Jt.Ex. I. It is clear from all the testimony,[2] however, that other oral terms were agreed to by the parties.

Under the contract Plaintiff agreed to pay Defendant $150 dollars a month for the term of the lease, which was to end on June 30, 1988. The rent was payable in advance monthly, beginning on October 15, 1987. Bills for electricity, water, minor repairs and maintenance of the property were to be paid by Plaintiff, the lessee. Plaintiff also was charged with taking care of the property with the necessary zeal and with responsibility for damage to the property due to his negligence. For violation of the terms of the lease by Plaintiff, Defendant, the lessor, could terminate the lease and demand vacation of the premises and compensation for damages, all pursuant to law. Jt.Ex. I.

The lease contains an ambiguous phrase concerning termination before its expiration date.[3] The parties' testimony and the

document here does not indicate that it contains all the terms of the agreement, and the testimony of both parties makes clear that there were other terms included in the agreement.

3. Paragraph J of the Spanish version of the lease mistakenly states that the "arrendadora" must notify the "arrendadora" one month in advance if he wishes to terminate the lease before its expiration date. Although the official

documents in evidence make clear that the parties intended that the lessee, Plaintiff, be able to terminate in advance of the lease's expiration date. Jt.Exs. III and IV; *see also infra.* The most important oral term agreed upon by the parties was that one of the bedrooms of the house would be available to Defendant for his use when he came to Puerto Rico from New York.

Plaintiff entered the leasehold in October 1987. He paid Defendant $300, which comprised the first month's rent and a security deposit. Prior to his taking possession, certain alterations and repairs had been made to the house. Among other things three small bedrooms had been reconfigured to make two larger bedrooms with closets, and washbasins and a medicine cabinet were added. Plaintiff testified that he paid about $1000 for materials for this work. Defendant admits that Plaintiff paid for some materials, estimating the cost to Plaintiff at $48. Defendant testified that he did not know if certain doors used belonged to Plaintiff. The Court finds that although Plaintiff incurred some indeterminate expense for materials used to renovate the house before the lease took effect, it seems unlikely that Plaintiff would have incurred expenses of $1000 for a leasehold which, when it came into existence, was for less than a year. There is no evidence of any agreement between the parties or promise by the Defendant to the effect that he would pay for such repairs.

In November, 1987 Plaintiff submitted notice by letter that he intended to begin looking for another place to live "after the Christmas holidays." Jt.Ex. III. He testified that the letter was intended to comply with the requirement of notifying Defendant. *Id.* Defendant's letter in response, Jt.Ex. IV, dated November 1987, shows that he joined in Plaintiff's interpretation. Rather than complaining that Plaintiff was trying to terminate illegally, Defendant asked Plaintiff in a postscript to the letter to please inform Defendant "before you leave the property." *Id.* Defendant never heard from Plaintiff that he was leaving the property.

Defendant returned to Puerto Rico early on the morning of January 27, 1988 to check on his property. He tried to gain admittance to his house then and again at 7 a.m. without success. Finally, at around 5 p.m. he obtained the key to the gate from neighbor David Loperena. Defendant spent a short time in the house, and then left to stay with friends, having changed the padlock on the gate to the fence which surrounds the property. Although Defendant testified that he did not change the padlock until February 28, when he left for New York, the Court does not believe him on this point.

Plaintiff testified quite credibly that he arrived at the house in the early evening of January 27 and could not open the gate. The Court credits this testimony because it is corroborated by the testimony of another witness, David Loperena,[4] and by a complaint filed in court by Plaintiff. PX 6. David Loperena testified that Defendant said he was going to change the locks to keep Plaintiff from getting the rest of his things out because Plaintiff had to answer to him for not paying the electric bill. Plaintiff later came to Loperena's house saying he had been locked out. Although Loperena admitted he had been drinking when Defendant came to his house to get the key, the Court found his memory of the events to be credible and detailed. On February 23, 1988 prior to the date on which Defendant admits changing the locks on the house and going back to New York, Plaintiff also filed a complaint in the Municipal Court in Carolina in which he recited that he had found himself locked out of his house.

When Defendant entered the house on January 27th, he found that Plaintiff had

---

translation translates the first "arrendadora" in paragraph J as lessor and the second as lessee, a different term "arrendataria" or "arrendatario" has been used on all other occasions in the lease to designate the lessee. The Court finds, therefore, that the translation is in error. The clause is ambiguous because it is unclear who has the right to terminate upon advance notice.

4. Plaintiff's testimony was also corroborated by that of Edwin Castro who was engaged to help Plaintiff move.

removed some of his furniture, but that there remained some furniture, clothing, books, personal effects, and boxes of kitchen utensils and food belonging to Plaintiff. The furniture remaining included a locked file cabinet, a dresser, a sofa, and a table and chairs. Defendant testified that the house was in shocking condition, that the dining room table was covered with dust, garbage was lying around, grapes were lying out on a table, the stove was filthy and in deplorable condition, window cranks were broken, the lawn was rutted, and there were rats.

Defendant testified that from the condition of the house, he thought Plaintiff had abandoned it. The Court finds that that conclusion was unwarranted. Many of Plaintiff's belongings and furniture were still in the house. Although David Loperena's mother told Defendant she had not seen Plaintiff for a few days, Loperena testified that he told Defendant that Plaintiff was in the process of moving out and to let him go.[5] Although Plaintiff testified that he was still living in the house at the time Defendant returned, the Court finds that he was not occupying the premises, but was in the process of moving out.

Defendant testified that he spent about $1000 putting the house back in order. He states that he spent $300 to replace the stove, $100 to replace the window cranks, about $700 for extermination services, and some money for reseeding the grass. Photographs which purportedly document the condition of the house prior to Plaintiff's tenancy and as Defendant found it in January 1988 were admitted as DX 40–92. Plaintiff testified that the photos represented as showing the house before he moved in also show it as he left it and that the photos showing slovenly housekeeping and

disarray do not represent the house as he left it. He testified that he never used the stove.

Defendant's testimony that the house was messy and dirty on January 27 had the ring of truth and was corroborated by the fact that David Loperena testified that Defendant wanted him to see the bad condition of the house. The Court believes Defendant's testimony that the house had become infested with roaches and rodents, requiring the ministrations of an exterminator. Since the house was in the possession of Plaintiff until Defendant arrived, the Court finds that condition of the house was due to Plaintiff's lack of care for it. The Court does not believe that the photographs all represent the condition of the house as Defendant found it, however. For example, Defendant testified that the photographs numbered 46, 47, 83, and 92 all show what he saw when he got to the house. That is impossible since the stove is pictured in the kitchen in two of the photographs, DX 83 and 92, and outside on the porch in another. DX 47. Clearly, someone had moved the stove before some of the pictures were taken. This lends some credence to Plaintiff's testimony that the house as depicted in the photographs was not as he had left it.

After Plaintiff found that he could not get into the house on January 27, he did not return again to ask Defendant to let him remove his belongings but rather sought to initiate legal proceedings to gain admittance. Defendant remained in the house throughout most of February without hearing from Plaintiff. Plaintiff claims that he was afraid of Defendant because Defendant had threatened to pay to have Plaintiff's head ripped off. David Loperena testified that the threats were made in

---

5. There was a conflict between the testimony of Defendant and David Loperena. Defendant testified that he did not speak to Loperena because Loperena was drunk. Witness Rodolfo Ortiz, who went with Defendant to Loperena's house, testified that he does not recall if the two talked. Loperena admitted he had been drinking when Defendant arrived to get the key, but described in detail a conversation they had had concerning, among other things, nonpayment of the electric bill for Defendant's house. Because Defendant and Loperena had dealings concerning Defendant's truck, about which Defendant testified that he was very angry, the Court finds it highly improbable that Defendant did not speak to Loperena when he went to his house to get the key after being in New York for several months. The Court also found Loperena's version of the conversation convincing because of the detail provided and because it seems to make sense in the context of what was then otherwise occurring.

his presence. Defendant denies having made the threats.

On the 24th of February Plaintiff saw Defendant at a local store and Defendant told him he should remove his belongings from the house by 6 p.m. that evening. Plaintiff did not do so and persisted with his legal proceedings. He testified that he did not want to go to the house alone and that he had sought police accompaniment, but that by the time he arrived Defendant had left.

Plaintiff's attorney prepared an application for a possessory injunction, but Plaintiff decided not to file it because he did not want to move into the house again. Plaintiff continued his other legal proceedings to retrieve his belongings, and Defendant returned to Puerto Rico at the end of March in response to a summons. Plaintiff and Defendant met with a judge on April 8 and arranged for Plaintiff to enter the house and get his remaining property. On April 15, Plaintiff, his attorney, Castro, Defendant and a few others met at the house. They entered the house[6], Plaintiff and Defendant each identified his property, and the attorney detailed the contents of the house in a notarial act. Jt.Ex. II. Plaintiff's clothing was found in Defendant's bedroom, and Defendant's clothing was found in Plaintiff's room. Plaintiff stated that a twelve carat emerald, $2500 to $3000 in cash, and "two pieces of steel, eight feet long with their base" were missing. He seeks recovery here for the emerald and the cash.

The Court finds that Plaintiff has not met his burden of showing he left either an emerald or any significant amount of cash in the house. Plaintiff testified that he had left a 12 carat emerald, valued at $65,000, in the pocket of his tuxedo in the closet of the house he rented from Defendant. The only corroborating evidence was provided by Plaintiff's attorney, Wilfredo Picorelli, who testified that at his initial interview

with Plaintiff, Plaintiff told him he could not get into the house and he had left clothing and some jewelry there, including an emerald. Picorelli's notes of that meeting refer to valuables and money, but not specifically to an emerald. Ex. K.

Plaintiff may, at one time, have possessed an emerald. A photograph of what could be either an emerald or green glass was admitted as an exhibit. Plaintiff also told an engaging tale of how he had acquired the stone in the photograph from a friend for whose hotel he had provided free laundry service over a period of years. Plaintiff further testified that the emerald had been photographed for him by a photographer who usually documented hair transplants. Even if the Court believed that Plaintiff had an emerald and that it is represented in the photograph, those facts merely show that he had an emerald in 1980 or 1981. The record is notably devoid of any evidence, other than Plaintiff's testimony, showing that Plaintiff had an emerald in his possession around the time he says it was lost. While Plaintiff testified that he usually left the emerald in his daughter's care and that he had retrieved it from her possession to show to David Loperena's mother, neither the daughter nor Mrs. Loperena testified. In fact, no one testified who had ever seen an emerald in Plaintiff's possession. This leads the Court to believe that no one *could* testify to having seen Plaintiff with an emerald around the pertinent time. There was no evidence of any insurance held for such a valuable item.

Moreover, Plaintiff's other behavior was also not consonant with that of someone who is concerned about a very valuable possession. After Plaintiff gained access to the house and asserted that the emerald and a large amount of cash were missing, he did not report them to the police as stolen items. Given the asserted value of the emerald and the money, it seems un-

---

6. Plaintiff opened the gate and the house with his keys. Although Plaintiff was able to enter in April, the Court does not find that he was equally able to enter the house on January 27. The locks were padlocks and easily changeable, and the Court finds that while on January 27 Defendant had put in place on the gate a padlock which Plaintiff could not open, he had at some time before the April 15 meeting of the parties and counsel on the premises switched padlocks so Plaintiff could enter.

likely that an owner would have left them in the pocket of his tuxedo. Moreover, the tuxedo seems an unlikely storage place when Plaintiff had a locked file cabinet on the premises.

Plaintiff also made only desultory attempts to get whatever property might be in the house. After the first rebuff at the locked gate, he did not attempt to go to the house for the whole month of February while Defendant was in Puerto Rico. Rather, Plaintiff seemed perfectly willing to let the court proceedings he had initiated run their course. Although he professed to be worried about alleged threats made by Defendant against him, the Court does not believe Plaintiff's testimony that fear kept him from more actively seeking the return of his property. It is conceivable that Defendant used idle threatening language in his anger about the condition of the house; however, the Court does not believe either from Plaintiff's demeanor and expression during his testimony or from his conduct that Plaintiff interpreted Defendant's words as serious threats. As both an attorney and a mature man, Plaintiff would have construed Defendant's angry language as the posturing that it was.

### Conclusions of Law
### A. Plaintiff's Claims

The Court finds that on January 27, 1988, when Defendant returned to Canovanillas from New York, the lease between him and Plaintiff was still in effect. Although the lease provided for thirty-day advance notice of termination, that clause is ambiguous, as described above, and can be interpreted with the aid of extrinsic evidence. The evidence here shows that the parties intended that the lessee should give *at least* 30 days notice to lessor before terminating the lease. As discussed above Plaintiff and Defendant both interpreted the clause as allowing Plaintiff to terminate early, and both Plaintiff's notice letter and Defendant's response to the notice indicate that neither party considered the lease to be terminated thirty days from the date of the notice.[7]

■ Although notice had been given that Plaintiff planned to leave the leased premises at some indeterminate time after Christmas, the Court concludes for two reasons that the lease had not terminated. First, Defendant had asked Plaintiff to inform him before Plaintiff left the property and no such notification was given, indicating that Plaintiff, who appeared punctilious about such matters, given the tone of the first notification letter, was not yet ready to surrender possession. Second, although Plaintiff was apparently in the process of moving out on January 27, he had not moved out.

■ Although neither party has cited any Puerto Rican law of abandonment, the Court is satisfied that abandonment of a leasehold in Puerto Rico, as elsewhere, requires both the act and intention of relinquishing the premises absolutely. Black's Law Dictionary (5th ed.), at 2. Plaintiff's and David Loperena's testimony and the presence of a significant quantity of Plaintiff's belongings in the house make clear that on January 27 Plaintiff had not abandoned the leased premises, for he had not intended at that point to relinquish the premises absolutely.

Defendant had an obligation under the Puerto Rican Civil Code "to maintain the lessee in the peaceful enjoyment of the lease during all the time of the contract." 31 L.P.R.A. § 4051. If Defendant believed

7. In his brief Defendant appears to argue two conflicting positions. First, he argues that the termination became effective on December 15, 1987, thirty days after Plaintiff's notice was sent. This is clearly not what was intended by the parties since Plaintiff said he planned to begin looking "after the Christmas holidays," and Defendant by return letter acknowledged the notification. Defendant also argues that the termination must have occurred on December 31, 1987 because every reasonable person knows that Christmas is over on December 31. Again, this is not persuasive since Plaintiff's letter said he would begin looking for a new place after the holidays. Defendant clearly accepted the indefinite nature of this, asking to be informed with more specificity before Plaintiff actually surrendered possession. Moreover, Defendant asked Plaintiff to "discontinue" discounting his rent payment, which strongly indicates that Defendant expected Plaintiff to remain in the house, thus requiring more rent payments.

that Plaintiff had breached the lease, had not paid the rent or was not taking care of the property, he had legal recourse. Article 1459 of the Puerto Rican Civil Code, 31 L.P.R.A. § 4066, provides a forcible entry and detainer action by which Defendant could have sought to oust Plaintiff. Article 370 of the Civil Code, 31 L.P.R.A. § 1444, also states specifically that "[i]n no case can possession be forcibly acquired so long as a possessor is opposed thereto. Any person who believes that he has a right or action to deprive another of the holding of a thing, shall petition the assistance of the competent authorities, provided the holder refuses to deliver up the said thing."

■ By locking Plaintiff out of the leasehold on January 27, Defendant breached both his obligation to maintain Plaintiff in the peaceful enjoyment of the leasehold and his obligation not to deprive Plaintiff of the leasehold without the assistance of law. Defendant is thus responsible to Plaintiff for any harm caused to him by the disturbance. *Goenaga v. West Indies Trading Corp.*, 88 P.R.R. 847 (1963).

The Court finds that Plaintiff has not adequately proved that he sustained any damages when he was excluded from the leasehold by Defendant. Although Plaintiff testified that he was still living at the Canovanillas house when Defendant changed the lock, the Court disbelieves that testimony. When Defendant arrived, a close neighbor, Mrs. Loperena, told him that she had not seen Plaintiff for a few days. His bed was no longer on the premises. Moreover, Defendant testified convincingly that he had gone to the house in the middle of the night and in the early morning of January 27th, finding Plaintiff's car gone both times and being unable to rouse anyone on the premises. The Court finds it more likely than not, therefore, that Plaintiff was, as David Loperena testified he told Defendant, in the process of moving out and that he was not staying in the house.

Although Plaintiff was wrongfully excluded from the property while the leasehold was still in effect, the Court cannot find that he incurred the damages he claims for having to find a more expensive furnished apartment quickly and for extra expenses for himself and his son due to the distance of the new lodgings from their activities. Clearly, Plaintiff had been planning to move out since November. Plaintiff also testified that if Defendant had waited a few more days, Plaintiff would have been out. These facts, coupled with the fact that Plaintiff was apparently moving and not still staying in the house, lead the Court to believe that Plaintiff had made prior arrangements, contrary to his testimony. Again, Plaintiff failed to provide corroborative evidence which might have made his claim more credible. Plaintiff has not submitted evidence from which the Court might determine damages caused by Plaintiff's loss of use of the property he had left in the house between the date he was locked out in January 1988 and the date on which he was able to reclaim the property in April 1988.

■ As discussed above, although Plaintiff has made claims to be reimbursed for money he spent on alterations to Defendant's house the Court finds no clear agreement under which Defendant is obligated to pay. Clearly, since the expenditures occurred prior to execution of the written lease, that document cannot provide the basis for Defendant's obligation to pay. Plaintiff testified that there were verbal agreements between Defendant and David Loperena and Norberto Rohena and himself concerning the repairs to be made to Defendant's house, but the Court has not heard testimony concerning the nature of all of these agreements. Plaintiff testified that the repairs on Defendant's house were to be performed by Rohena in return for money Rohena owed Plaintiff. Plaintiff has not testified to any undertaking by Defendant to pay for the expenses incurred by Plaintiff.

"Unless damages actually exist and are sufficiently proved, there can be no compensation, since Puerto Rico law does not sanction punitive damages." *Riofrio Anda v. Ralston Purina Co.*, 772 F.Supp. 46, 52 (D.P.R.1991). Even if Defendant in

this case were under some duty to pay Plaintiff for his expenditures, Plaintiff has not submitted adequate proof of how much he spent on the repairs. Specifically, Plaintiff testified that he spent close to or over $1000 for a medicine cabinet and materials purchased by David Loperena for the repairs. There was no breakdown of the expenditures provided. David Loperena testified, however, that Plaintiff paid $1500 for the improvements, again with no itemization of the costs. Defendant testified that Plaintiff might have paid $48 for certain lumber for the project. On this record, the Court could not reach any determination of Plaintiff's out of pocket expenses.

▉ Plaintiff has further alleged that Defendant was negligent in his care of Plaintiff's belongings on the property, and he claims damages for the loss, through this alleged negligence, of the emerald and $2500 or $3000 in cash. As discussed above, Plaintiff has not met his burden of showing that he had an emerald and a large amount of cash on the premises when Defendant locked him out. Therefore, even if Defendant had been shown to be negligent, which he has not, Plaintiff has not proven the damages which he seeks.

▉ Finally, Plaintiff claims that he has suffered severe mental anguish because Defendant locked him out of the rented property. As the Court said in *Riofrio Anda v. Ralston Purina Co.*, 772 F.Supp. at 53: "Although Puerto Rico recognizes moral damages for breach of contract, ... moral damages for emotional distress will not be awarded unless evidence establishes that the mental condition of the claimant has been *considerably* affected." As the court also noted, even under the more liberal standard for awarding such damages under Puerto Rican tort law, there must still be "a showing that in 'some *apprecia-*

*ble* measure the health, welfare and happiness of the claimant were *really* affected.'" The Court finds that the proof here does not meet either standard.

Plaintiff testified that finding himself locked out of his house, he was terribly anguished and in a state of nerves, and his blood pressure became and remained high. The Court does not accept Plaintiff's uncorroborated testimony as proving 1) that his blood pressure increased at the time of the lockout, and 2) that the increase was *caused by* Defendant's conduct. Plaintiff is not a physician, and he did not testify to having visited a physician. If Plaintiff's statement was intended not to prove medical fact but to be merely colloquially descriptive of his state of distress, the Court did not find it very persuasive. The testimony was delivered in a perfunctory manner and the Court was not left with the belief that Plaintiff had been considerably affected. The Court has found that Plaintiff was not staying in the house at the time he found himself locked out and that he had left his belongings there until he could move them. Thus, being locked out merely continued a situation which Plaintiff had begun and was not likely to have caused terrible anguish. David Loperena testified that Plaintiff was very worried because all of his property was in the house. Plaintiff, however, immediately acted on his worry by instituting legal proceedings, which seemed likely to get his belongings back shortly.

Other testimony, by Plaintiff and Edwin Castro[8], indicated that Plaintiff was in mental distress because of the alleged threats by Defendant. As previously stated, the Court finds that Plaintiff was not as distressed by the threats as he has testified. On the basis of the record before it, the Court finds that Defendant did interfere with Plaintiff's peaceful enjoyment of

---

**8.** Edwin Castro's testimony was not particularly credible in its entirety because he seemed to be reciting events by rote without having a real memory of them. His memory of dates of certain events does not coincide with that of any of the other witnesses, and when he was pressed his story became much more confused. In any event, Castro testified that as he and Plaintiff

were driving, they were flagged down by Defendant and Plaintiff did not want to stop because he was fearful. Plaintiff did stop, however, and engage in conversation with Defendant, leading the Court to believe that even if Castro were telling the truth about Plaintiff's state of mind, Plaintiff was not so fearful that his anxiety affected him in any considerable manner.

his leasehold and that Plaintiff did suffer some slight mental anguish because of being prevented from entering his house. The Court does not find, however, that this mental distress was significant enough to warrant an award of damages.

### B. *Counterclaims*

Defendant has filed a counterclaim in this suit seeking payment of rent. The record shows clearly that Plaintiff paid $300 at the inception of the lease for the first month's rent and a security deposit. Plaintiff also sent Defendant a check for $125 for the second month's rent, representing the second monthly payment minus $25 for cutting the grass. Defendant informed Plaintiff that he should *"discontinue"* this reduction in the rent, because he does "not agree with that discount." The Court finds that Defendant by the terms of his reply letter accepted the reduced payment for the second monthly payment, but indicated that he did not agree to it for future payments. The Court bases this finding both on Defendant's use of the word "discontinue" and on his failure to request that Plaintiff pay him the deducted $25. The Court finds, therefore, that taking into account the security deposit, Defendant had received the equivalent of three months rent, which would have covered Plaintiff's occupancy through mid-January.[9]

■ Under the terms of the lease and the civil code, 31 L.P.R.A. § 4052, Plaintiff was obligated to continue paying rent as long as he remained in possession, and he was in arrears as of the time of Defendant's arrival. He clearly was not obligated, however, to pay rent for the period after he was excluded from the property. Taking into account the rent and security deposit paid by Plaintiff, the Court finds, therefore, that Plaintiff owes Defendant $60 for rent for the period between January 15th and 27th, during which he was in possession. Defendant is not entitled to collect rent for the period after January 27, 1988 during which Plaintiff was seeking through the legal process to regain access to the property.

■ Defendant also seeks $1000 for damages to the house caused by Plaintiff's negligence and failure to maintain the property in good condition. Under the lease itself and under the Puerto Rican Civil Code, the lessee has a duty to use the leasehold as would a diligent father of a family. 31 L.P.R.A. § 4052. The Code also makes the lessee liable for the deterioration suffered by the thing leased, unless he proves that it took place without his fault. 31 L.P.R.A. § 4060; *see Cabinero v. Cobian; Hanover Fire Ins. Co.*, 81 P.R.R. 926 (1960). The Court has found that Plaintiff left the house dirty and that his lack of care had caused it to become infested. Defendant testified that he spent about $700 for an exterminator's services. Plaintiff is responsible for this expense.

Although Defendant testified that Plaintiff had ruined the stove, the Court cannot award the $300 damages Defendant seeks for having replaced it. First, although the photographs of the stove show a degraded kitchen appliance, as described above, the Court cannot have complete confidence in the photographs as showing the condition of the stove when Defendant arrived. If the photographs are accurate, it seems very unlikely that the stove could have been in perfect condition and arrived in such a state in the three months of Plaintiff's tenancy. In the pictures it appears very rusty and old looking as well as dirty. David Loperena's testimony confirms this observation. He stated, and the Court believes his testimony over that of Defendant on this point, that when Plaintiff moved in

---

9. Plaintiff testified that in October he loaned Defendant another $300 to buy airline tickets to New York and that Defendant said to deduct that amount from the rent. David Loperena also testified to the loan, but he placed the date in February. The Court does not believe that such a loan and agreement took place. First, if Plaintiff had made such a loan in October, to be credited to rent, he would have been unlikely then to have remitted the November rent for it would have been paid by the credit. The Court does not believe that the loan occurred in February because Plaintiff and Defendant were on very bad terms at that point and it would not have been contemplated by either party that Plaintiff would continue to stay in the house and pay rent against which the loan could be credited.

there was an old, run down stove in the house with only two working burners. Although Defendant testified to the stove being dirty and encrusted with grease, that in itself would not require its replacement. The Court cannot find, therefore, that the stove, was ruined during Plaintiff's tenancy so that it required replacement.

Defendant also testified that he had to replace cranks on the windows in the house. Defendant could not recall how many cranks he replaced, but he estimated that he replaced ten at $10 apiece. There was no testimony that all the cranks were in working order when Plaintiff entered the leasehold, and given the photo showing damage to one crank, the Court finds it unlikely that Plaintiff broke ten in the course of a three month tenancy. The Court is not satisfied from the evidence before it that ten window cranks worth $100 were destroyed during Plaintiff's tenancy.

Defendant also testified that he bought grass seed to reseed the lawn. He did not testify how much it cost, so he has not proved that element of damage. Also, while Defendant testified that he did most of the work required to put the house back in proper condition, there is no evidence from which the Court might translate this testimony into a damages award.

 Defendant's third counterclaim seeks attorney's fees under a clause in the contract requiring Plaintiff to pay reasonable expenses arising out of a legal action due to a breach of contract. Defendant presented no evidence on this claim and has not addressed it in his brief. The issue is, therefore, waived. *Collins v. Marina–Martinez*, 894 F.2d 474, 481 n. 9 (1st Cir. 1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by any effort at developed argumentation are deemed waived.")

Defendant also seeks $200,000 for mental anguish and emotional distress caused by Plaintiff's lawsuit and the destruction of Defendant's property. Although the Court has found no damages for Plaintiff, it did find that Defendant had wrongfully interfered with Plaintiff's peaceful enjoyment of the leasehold. The suit is, therefore, not frivolous. The asserted "destruction" of Defendant's property has turned out to be merely that Plaintiff left the house dirty, a condition remediable by Defendant in a few days. The Court is not persuaded by Defendant's testimony that because he was very "disappointed" and angry at the condition of his "dream" house, his mental condition has been *considerably* affected or that in "'some *appreciable* measure the health, welfare and happiness of the claimant were *really* affected.'" *Riofrio Anda v. Ralston Purina Co.*, 772 F.Supp. at 53. Since Defendant was willing to rent the house in the first place, his tie to it could not have been such that he could not bear any change in its condition. Moreover, since he required a security deposit, he must have contemplated and accepted the possibility of an outcome of the rental situation similar to that which occurred. Defendant has not made a showing of mental distress adequate to require compensation in damages.

Finally, Defendant has not presented evidence or argument on his counterclaim for slander. That counterclaim is therefore deemed waived. *Collins v. Marina–Martinez*, 894 F.2d at 481 n. 9.

Accordingly, the Court finds that Plaintiff is liable to Defendant in the amount of $760 for unpaid rent and for his failure to care for Defendant's property as required by law.

SO ORDERED.