UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 94-2138

WILFREDO MARTINEZ, a/k/a WILFREDO MARTINEZ RODRIGUEZ,

Plaintiff, Appellant,

v.

RAFAEL COLON, a/k/a RAFAEL COLON PIZARRO, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. District Judge] 



Before

Torruella, Chief Judge, 

Bownes, Senior Circuit Judge, 

and Selya, Circuit Judge. 



John E. Mudd, with whom Howard Charles and Ortiz Toro & 
Ortiz Brunet Law Offices were on brief, for appellant. 
Edgardo Rodriguez-Quilichini, Assistant Solicitor General, 
with whom Pedro Delgado Hernandez, Solicitor General, and Carlos 
Lugo Fiol, Deputy Solicitor General, were on brief, for 
appellees.



May 31, 1995



SELYA, Circuit Judge. This appeal raises interesting SELYA, Circuit Judge. 

questions about the contours of 42 U.S.C. 1983 (1988) and the

reach of the Supreme Court's core holding in DeShaney v. 

Winnebago County Social Servs. Dep't, 489 U.S. 189 (1989). 

Concluding, as we do, that the court below appropriately applied

DeShaney, we affirm the entry of summary judgment in the 

defendants' favor.

I. BACKGROUND I. BACKGROUND

Consistent with the method of Fed. R. Civ. P. 56, we

canvass the material facts in a light that flatters, but does not

impermissibly distort, the plaintiff's claims. We then recount

the travel of the case.

A. The Facts. A. The Facts. 

We outline the facts, omitting the graphic details on

which our dissenting brother prefers to dwell. In our view,

these details are not relevant to the legal issues posed on

appeal.

In the early morning hours of May 26, 1988, plaintiff-

appellant Wilfredo Martinez Rodriguez (Martinez), a youthful

member of Puerto Rico's police force, drove to the Loiza Street

Precinct, located in the San Juan metropolitan area. Though

Martinez was not scheduled to begin his shift until 4:00 a.m., he

arrived early, pursuant to local custom, in order to procure his

post assignment. Martinez alleges that he was on duty from the

moment he arrived even before his shift began because from

that point forward he was subject to the shift commander's

2

orders.

Upon Martinez' arrival, a fellow officer who was on

duty at the time, Angel Valentin Corali (Valentin), approached

Martinez' car and called him "pretty boy" ("papito lindo"). When

Martinez alighted, Valentin drew his service revolver, pointed it

at Martinez' stomach, cocked the hammer, placed his finger on the

trigger, and inquired if Martinez was afraid. Valentin then

disarmed the weapon, and Martinez hurried inside the station,

first telling Valentin: "Don't horse around with that because

you will kill me."

Shortly after this fracas had occurred, Valentin

accosted Martinez in the radio room, inserted his finger into a

small hole in Martinez' undershirt, and ripped it. Once again,

Martinez walked away from Valentin. He then changed into his

uniform, entered the waiting room, and reported to his shift

supervisor, defendant-appellee Juan Trinidad Marrero (Trinidad).

Soon thereafter, Valentin reappeared, pointed his

revolver at Martinez' genitals, cocked the hammer, and, with his

finger on the trigger, threatened to "blow away" Martinez' penis

(asking him, somewhat rhetorically, if he was scared). When

Valentin lowered the weapon, Martinez immediately moved away from

him. Within minutes Valentin again approached Martinez, cocked

the revolver, aimed it at Martinez' groin, and resumed his

taunting. The revolver accidentally discharged, maiming

Martinez.

The first encounter took place in the precinct's

3

parking lot and the rest transpired inside the police station.

According to Martinez, roughly twenty minutes elapsed from start

to finish. All parties agree that the shooting, which occurred

before the 4:00 a.m. shift change, was unintentional.1

B. Travel of the Case. B. Travel of the Case. 

On May 22, 1989, Martinez filed suit in federal

district court against numerous defendants, including, as

relevant here, Rafael Colon Pizarro (Colon), Luis A. Velez Rentas

(Velez), and Trinidad (collectively, "the officers" or "the

defendants").2 Invoking 42 U.S.C. 1983 and premising

jurisdiction on the existence of a federal question, see 28 

U.S.C. 1331 (1988), he alleged that his rights had been

abridged in that each defendant owed him a duty to intervene and

protect him from readily discernible harm at the hands of a

fellow officer, but each defendant breached this duty by

subsequent inaction.3 Martinez asserted pendent tort claims

with respect to all three defendants and, with respect to
 

1In his memorandum of law in support of his opposition to
defendant Carlos Lopez-Feliciano's motion to dismiss, Martinez
stated that "the revolver apparently fired by accident." Record
Appendix at 21. At any rate, the summary judgment record
contains no facts that would support a contrary finding; and, for
aught that appears, Martinez has never asserted that Valentin
shot him intentionally.

2Plaintiff asserted claims against several other defendants,
including Valentin and Lopez-Feliciano. Those claims are not
before us, and we ignore them for purposes of this opinion.

3Although the underlying facts are hotly contested, we
assume for purposes of this appeal, as Martinez would have it,
that all three defendants witnessed the entire progression of
events and had a meaningful opportunity to intervene at each step
along the way.

4

Trinidad, asserted a section 1983 claim based on supervisory

liability.

After a flurry of pretrial discovery, the officers

moved for summary judgment. They argued, inter alia, that 

Valentin was not acting under color of state law when the mishap

occurred; and that, therefore, onlooker officers did not have a

constitutional duty to intervene on Martinez' behalf. The

district court referred the motions and Martinez' timely

opposition to a magistrate judge. The magistrate concluded that,

under DeShaney, the officers had no constitutional obligation to 

protect Martinez from Valentin's actions, and urged the district

court to grant summary judgment. The plaintiff objected to the

magistrate's report and recommendation, but the district court,

affording de novo review, see Fed. R. Civ. P. 72(b), adopted the 

report, accepted the recommendation, and entered judgment

accordingly. This appeal followed.

II. THE SUMMARY JUDGMENT STANDARD II. THE SUMMARY JUDGMENT STANDARD

A district court may grant summary judgment only "if

the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c). We have charted the boundaries of this

rule in case after case, see, e.g., Coyne v. Taber Partners I, 

F.3d , (1st Cir. 1995) [No. 94-2231, slip op. at 4-5];

National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 

5

(1st Cir. 1995), petition for cert. filed, 63 U.S.L.W. 3736 (U.S. 

Apr. 4, 1995) (No. 94-1630); Vasapolli v. Rostoff, 39 F.3d 27, 32 

(1st Cir. 1994); Dow v. United Bhd. of Carpenters, 1 F.3d 56, 58 

(1st Cir. 1993); Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 

1993); Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 793-94 

(1st Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993); United 

States v. One Parcel of Real Property (Great Harbor Neck, New 

Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992); Rivera- 

Muriente v. Agosto-Alicea, 959 F.2d 349, 351-52 (1st Cir. 1992); 

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 7-8 (1st 

Cir. 1990); Garside v. Osco Drug, Inc., 895 F.2d 46, 48-49 (1st 

Cir. 1990); Brennan v. Hendrigan, 888 F.2d 189, 191-92 (1st Cir. 

1989), and it would serve no useful purpose to draw that map

anew.

For present purposes, we need say no more than that

summary judgment will lie if the record, even when taken in the

aspect most favorable to the nonmovant, see Rivera-Muriente, 959 

F.2d at 352, fails to yield a trialworthy issue as to some

material fact. In applying this principle, it is important to

bear in mind that not every genuine factual conflict necessitates

a trial. It is only when a disputed fact has the potential to

change the outcome of the suit under the governing law if found

favorably to the nonmovant that the materiality hurdle is

cleared. See One Parcel, 960 F.2d at 204. Here, the record 

reflects a veritable salmagundi of bitterly disputed facts but

none that is material.

6

To that extent, then, our task is simplified.

Exercising de novo review, see Pagano, 983 F.2d at 347, and 

adopting the plaintiff's version of all controverted facts (but

not, however, giving credence to "conclusory allegations,

improbable inferences, [or] unsupported speculation," Medina- 

Munoz, 896 F.2d at 8), we conclude that the court below did not 

err in jettisoning the section 1983 claims.

III. ANALYSIS III. ANALYSIS

There are two essential elements of an action under

section 1983: "(i) that the conduct complained of has been

committed under color of state law, and (ii) that this conduct

worked a denial of rights secured by the Constitution or laws of

the United States." Chongris v. Board of Appeals, 811 F.2d 36, 

40 (1st Cir.), cert. denied, 483 U.S. 1021 (1987); accord West v. 

Atkins, 487 U.S. 42, 48 (1988); Daniels v. Williams, 474 U.S. 

327, 330-31 (1986). Of course, the reference to "state law"

cannot be taken literally, for Puerto Rico enjoys the functional

equivalent of statehood in regard to section 1983 and, thus,

state law includes Puerto Rico law. See Playboy Enters., Inc. v. 

Public Serv. Comm'n of P.R., 906 F.2d 25, 31 n.8 (1st Cir.), 

cert. denied, 498 U.S. 959 (1990); Berrios v. Inter Am. Univ., 

535 F.2d 1330, 1331 n.3 (1st Cir.), appeal dismissed, 426 U.S. 

942 (1976).

For purposes of this appeal, the defendants do not

contest the plaintiff's allegation that, at all relevant times,

the defendants were on duty and acting under color of state law.

7

This concession reduces our inquiry to whether the facts, taken

most congenially to the plaintiff, can support a finding that the

defendants violated a right secured to the plaintiff either by

the Constitution or by federal law. Since the plaintiff has not

alleged the transgression of any right secured to him under a

federal statute, we may narrow the inquiry still further,

limiting it to whether the facts show a violation of a

constitutional right. It is to this elusive question that we

next proceed.

A. The Duty to Intervene. A. The Duty to Intervene. 

Plaintiff pins his hopes principally on a claim that

the defendants' failure to protect him from the imminent peril

posed by Valentin abridged his right to substantive due process.

The touchstone of the law in this area is the Supreme Court's

opinion in DeShaney. There, a child sued for damages under 42 

U.S.C. 1983, claiming that employees of a state-run social

service agency, on notice of a parent's abusive behavior,

nonetheless failed to protect the child from the readily

foreseeable danger. See DeShaney, 489 U.S. at 193. The Court 

affirmed the entry of summary judgment in defendants' favor.

Chief Justice Rehnquist, writing for the majority, explained that

the Due Process Clause ordinarily does not require the state to

protect an individual's life, limb, or property against the

marauding of third parties not acting to the state's behoof. See 

id. at 196. Consequently, "a State's failure to protect an 

individual against private violence simply does not constitute a

8

violation of the Due Process Clause." Id. at 197. 

Although the DeShaney Court left open the possibility 

of certain circumscribed exceptions to the general rule of

nonliability, Martinez makes no effort to slide within them. He

does not argue that he was in the custody of the state, see id. 

at 198-200 (discussing right to protection arising in favor of

incarcerated prisoners and involuntarily committed mental

patients), or that he was in its "functional custody," see id. at 

201 n.9 (discussing possible existence of situations analogous to

incarceration or institutionalization), or that the state made

him more vulnerable to Valentin's actions, see id. at 201. 

Rather, Martinez contends that DeShaney is altogether inapposite. 

To the extent that this contention is based simply and

solely on the fact that, unlike in DeShaney, the defendants here 

are police officers, not social workers, we reject it. Of

course, police officers sometimes have an affirmative duty to 

intervene that is enforceable under the Due Process Clause. For

example, "[a]n officer who is present at the scene [of an arrest]

and who fails to take reasonable steps to protect the victim of

another officer's use of excessive force can be held liable under

section 1983 for his nonfeasance," provided that he had a

"realistic opportunity" to prevent the other officer's actions.

Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st 

Cir. 1990), cert. denied, 500 U.S. 956 (1991); accord O'Neill v. 

Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988). But this line of 

cases does not, as plaintiff importunes, carve out an exception

9

to the DeShaney rule. Instead, such cases escape the rule 

because the aggressor is acting under color of his public office.

Gaudreault illustrates the point. The quoted statement 

specifically contemplates that the underlying tortious conduct

take place within the context of an arrest, interrogation, or

similar maneuver, see Gaudreault, 923 F.2d at 206-07 & n.3, in 

which a differential exists between the victim and the officer

precisely because of the latter's status as one empowered to

enforce the law, coercively if necessary, against the former.

Similarly, O'Neill involved the beating of a handcuffed man by 

law enforcement officers during an interrogation in the detention

area of a police station. See O'Neill, 839 F.2d at 10. We 

cannot imagine a more paradigmatic exercise of state authority

than the processes of handcuffing, detaining, and interrogating a

citizen. Gaudreault and O'Neill, then, are cases in which the 

aggressor is acting under color of state law. The DeShaney rule 

which addresses the "State's failure to protect an individual

against private violence," DeShaney, 489 U.S. at 197 (emphasis 

supplied) is not implicated in such cases because the violence

in question is not private but "public," i.e., attributable to 

state action.4
 

4A constitutional duty to intervene may also arise if
onlooker officers are instrumental in assisting the actual
attacker to place the victim in a vulnerable position. See, 
e.g., Byrd v. Brishke, 466 F.2d 6, 9-11 (7th Cir. 1972); cf. 
DeShaney, 489 U.S. at 201 (recognizing a possible affirmative 
constitutional duty to protect against certain dangers if the
state takes "part in their creation" or does something "to render
[the victim] more vulnerable to them"). In such a scenario, the
onlooker officers and the aggressor officer are essentially joint

10

Private violence even private violence engaged in by

one who happens to work for the state has different legal

ramifications than violence attributable to state action. See, 

e.g., Hughes v. Halifax County Sch. Bd., 855 F.2d 183, 186-87 

(4th Cir. 1988) (distinguishing private actions of county

maintenance workers from cases in which "the actions complained

of were committed while the defendants were purporting to act

under the authority vested in them by the state, or were

otherwise made possible because of the privileges of their

employment"), cert. denied, 488 U.S. 1042 (1989). 

Thus we recently held, in light of DeShaney, that a 

district attorney's office had no constitutional obligation to

protect a citizen against self-inflicted private violence (there,

noncustodial suicide) alleged to have been caused by the state's

implication of him in a multiple murder case. See Souza v. Pina, 

F.3d , (1st Cir. 1995) [No. 94-2079, slip op. at 9-

11]. Interpreting DeShaney to say that the state has no 

generalized duty to protect its citizens from violence except

when it sets the stage by acting affirmatively (as in a custodial

setting), see id. at [slip op. at 9], we concluded that, 

although the state's acts may have "rendered [the decedent] more

vulnerable to danger in the sense that those acts may have

 

tortfeasors and, therefore, may incur shared constitutional
responsibility. See generally Monroe v. Pape, 365 U.S. 167, 187 
(1961) (advising courts to read section 1983 against the backdrop
of historical tort liability). Because there is no indication of
any such joint enterprise here, we have no occasion to explore
the viability of the theory.

11

exacerbated or even brought about [the decedent's] suicidal

tendencies . . . these are not the kind of `affirmative acts' by

the state that would give rise to a constitutional duty to

protect." Id. at [slip op. at 10] (citing Monahan v. 

Dorchester Counseling Ctr., Inc., 961 F.2d 987, 992-93 (1st Cir. 

1992)).

Translated to the police milieu, these cases mean that

when an on-duty police officer witnesses violence, the existence

vel non of a constitutional duty to intervene will most often 

hinge on whether he is witnessing private violence or violence

attributable to state action. It remains to be seen how and

where the line that separates one from the other should be drawn.

B. Private Action. B. Private Action. 

In attempting to distinguish private violence from

violence attributable to state action for purposes of applying

the DeShaney rule, courts must beware simplistic solutions. To 

be sure, violence is attributable to state action if the

perpetrator is acting under color of state law, see, e.g., 

Earnest v. Lowentritt, 690 F.2d 1198, 1200 (5th Cir. 1982) 

("Section 1983 does not reach all constitutional injuries, but

only those caused by persons acting `under color of state

law.'"), but that is a virtual tautology. Furthermore, the

construct "acting under color of state law" rarely depends on

any single, easily determinable fact, such as a policeman's garb,

see, e.g., Stengel v. Belcher, 522 F.2d 438, 441 (6th Cir. 1975) 

(explaining that whether a police officer is "in or out of

12

uniform is not controlling"), cert. dismissed, 429 U.S. 118 

(1976), duty status, see, e.g., Pitchell v. Callan, 13 F.3d 545, 

548 (2d Cir. 1994) (explaining that "whether an officer was on or

off duty when the challenged incident occurred" is not

dispositive); Stengel, 522 F.2d at 441 (same), or whereabouts, 

see, e.g., Delcambre v. Delcambre, 635 F.2d 407, 408 (5th Cir. 

1981) (per curiam) (holding that a police chief's assault on a

private citizen was not conduct under color of law even though it

occurred at police headquarters). Nor does "acting under color

of state law" depend on whether an officer stays strictly within

the line of duty, or oversteps it. See Monroe v. Pape, 365 U.S. 

167, 172 (1961); Screws v. United States, 325 U.S. 91, 111 

(1945). For instance, a police officer who exercises, but

misuses or exceeds, his lawfully possessed authority is generally

thought to be acting under color of law. See, e.g., Gibson v. 

City of Chicago, 910 F.2d 1510, 1518 (7th Cir. 1990). 

The point is that segregating private action from state

action calls for a more sophisticated analysis. In general,

section 1983 is not implicated unless a state actor's conduct

occurs in the course of performing an actual or apparent duty of

his office, or unless the conduct is such that the actor could

not have behaved in that way but for the authority of his office.

Thus, whether a police officer is acting under color of state law

turns on the nature and circumstances of the officer's conduct

and the relationship of that conduct to the performance of his

official duties. See Pickrel v. City of Springfield, 45 F.3d 

13

1115, 1118 (7th Cir. 1995); Anthony v. County of Sacramento, 845 

F. Supp. 1396, 1400 (E.D. Cal. 1994).

We think this focus follows inexorably from West, where 

the Court wrote that "[t]he traditional definition of acting

under color of state law requires that the defendant . . . have

exercised power `possessed by virtue of state law and made

possible only because the wrongdoer is clothed with the authority

of state law.'" West, 487 U.S. at 49 (quoting United States v. 

Classic, 313 U.S. 299, 326 (1941)). Hence, a person acts under 

color of state law "when he abuses the position given to him by

the State." Id. at 50. The key determinant is whether the 

actor, at the time in question, purposes to act in an official

capacity or to exercise official responsibilities pursuant to

state law. See id. 

Logically, then, not every action undertaken by a

person who happens to be a police officer is attributable to the

state. Though "under `color' of law means under `pretense' of

law," even so, the acts of state officials "in the ambit of their

personal pursuits" are not state action. Screws, 325 U.S. at 

111; see also Gibson, 910 F.2d at 1518. Accordingly, a 

policeman's private conduct, outside the line of duty and unaided

by any indicia of actual or ostensible state authority, is not

conduct occurring under color of state law. See Barna v. City of 

Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994); United States v. 

Tarpley, 945 F.2d 806, 809 (5th Cir. 1991), cert. denied, 112 S. 

Ct. 1960 (1992); Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476, 

14

479 (9th Cir. 1991); Murphy v. Chicago Transit Auth., 638 F. 

Supp. 464, 467 (N.D. Ill. 1986); Johnson v. Hackett, 284 F. Supp. 

933, 937 (E.D. Pa. 1968). Even though "acting under color of

law" includes "acting under pretense of law" for purposes of a

state action analysis, there can be no pretense if the challenged

conduct is not related in some meaningful way either to the

officer's governmental status or to the performance of his

duties.

C. Separating Wheat from Chaff. C. Separating Wheat from Chaff. 

Explicating the standard for segregating private action

from action attributable to the state does not complete our task.

Since the private conduct of police officers does not constitute

action attributable to the state and, therefore, does not give

rise to section 1983 liability under DeShaney or otherwise, we 

must determine whether Valentin, at the time and place in

question, was engaged in purely personal pursuits or, conversely,

whether he was acting under color of state law. To do so, we

must assess the nature of his conduct in light of the totality of

surrounding circumstances. See Pitchell, 13 F.3d at 548; Revene 

v. Charles County Comm'rs, 882 F.2d 870, 872-73 (4th Cir. 1989); 

Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir. 1980). 

Here, the record is transpicuously clear that

throughout the course of Martinez' ordeal Valentin did not

exercise, or purport to exercise, any power (real or pretended)

possessed by virtue of state law. To the contrary, Valentin was

15

bent on a singularly personal frolic: tormenting an

acquaintance.5 Though on duty and in uniform, Valentin's status

as a police officer simply did not enter into his benighted

harassment of his fellow officer. Hazing of this sort, though

reprehensible, is not action under color or pretense of law.

Nor can it be said that Valentin's actions were in any

meaningful way related either to his official status or to the

performance of his police duties. In this regard, the case bears

a resemblance to Delcambre. There, the Fifth Circuit ruled that 

the plaintiff, who had been assaulted on the premises of the

municipal police station by her brother-in-law, the police chief,

had no cognizable claim under 42 U.S.C. 1983. See Delcambre, 

635 F.2d at 408. The assault arose out of a family squabble, and

the court found that the police chief, though on duty, "was not

acting under color of law as required for liability under

[section 1983]." Id. 

To be sure, Valentin shot Martinez with his service

revolver, and in that sense it might be argued that the shooting

was made possible by Valentin's status as a police officer. See 

Cassady v. Tackett, 938 F.2d 693, 695 (6th Cir. 1991) (concluding 

that, in "allegedly flourishing and threatening to use his gun"

against a coworker, the defendant acted under color of state law

because he "had authority or power to carry the gun in the jail

 

5To use the plaintiff's spoken characterization, Valentin
was "hors[ing] around"; or, as plaintiff put it in his second
amended complaint, "playing `Russian roulette' with another man's
genitalia."

16

only because he was [the county's] elected jailer"). This

argument succumbs for a very basic reason: plaintiff did not

proffer it either in the district court or in his appellate

brief. The argument is, therefore, not properly before us. See 

United States v. Slade, 980 F.2d 27, 30 n.3 (1st Cir. 1992) 

(stating that theories not briefed on appeal are waived);

Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline 

Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle 

is settled in this circuit, it is that, absent the most

extraordinary circumstances, legal theories not raised squarely

in the lower court cannot be broached for the first time on

appeal.").

Even if the argument were properly before us, we would

not embrace it. We do not think it is reasonable to hold that

every use of a policeman's gun, even in the course of purely 

personal pursuits, creates a cause of action under section 1983.

Instead, we are of the view that the context in which a service

revolver is used, not just the mere fact of its use, must be

consulted to determine the constitutional relevance of the

officer's conduct. See Payne v. Government of D.C., 559 F.2d 

809, 825 n.9 (D.C. Cir. 1977). Consequently, "[w]hile a police

officer's use of a state-issue weapon in the pursuit of private

activities will have `furthered' the 1983 violation in a

literal sense," a court needs "additional indicia of state

authority to conclude that the officer acted under color of state

law." Barna, 42 F.3d at 817-18 (holding that "unauthorized use 

17

of a police-issue nightstick is simply not enough to color [a]

clearly personal family dispute with the imprimatur of state

authority").

Here, plaintiff has not produced any evidence tending

to show that his tormentor, when brandishing the firearm, was

exercising or purporting to exercise police power.6 In the

absence of any additional indicia of state action, we believe

that the unauthorized use of a government-issue weapon is too

attenuated a link to hold together a section 1983 claim. See 

Barna, 42 F.3d at 818-19; Payne, 559 F.2d at 825 n.9; see also 

Bonsignore v. City of N.Y., 683 F.2d 635, 638-39 (2d Cir. 1982) 

(holding that a police officer who wounded his wife and killed

himself using a gun which he was authorized to carry because of

his status as an officer "was not acting under color of state law

since his actions were not `committed in the performance of any
 

6Had Martinez been a civilian rather than a fellow officer,
the significance of Valentin's uniform and weapon for purposes of
the color-of-law determination might well have been greater.
See, e.g., Jones v. Gutschenritter, 909 F.2d 1208, 1212-13 (8th 
Cir. 1990) (observing that the presence of a uniformed and armed
police officer may reasonably cause a civilian to refrain from
taking action to protect his rights). But when the victim is
himself a fellow officer and the particular interaction between
the two officers is of a distinctively personal nature, it can
generally be assumed that the aggressor's official trappings,
without more, will not lead the victim to believe that the
aggressor is acting with the imprimatur of the state and, in
turn, to forgo exercising his legal rights. The facts in this
case are congruent with this hypothesis. The campaign of terror
that Valentin mounted was patently personal in nature, and
Martinez unquestionably realized as much; indeed, there was not
the slightest indication that Valentin's conduct was undertaken
pursuant to the authority of his office. Plainly, the fact that
Martinez walked away numerous times shows that he was not "so
intimidated" by Valentin's status as a policeman "as to cause him
to refrain from exercising his legal right[s]." Id. at 1212. 

18

actual or pretended duty,' but were performed `in the ambit of

[his] personal pursuits'") (quoting Screws, 325 U.S. at 111; 

Johnson, 284 F. Supp. at 937). 

We add an eschatocol of sorts. Even if a

constitutional duty to intervene conceivably could be dragooned

from these facts, then in that event the location of this case in

the penumbra of DeShaney dictates that the defendants nonetheless 

would enjoy qualified immunity and, since appellant's suit only

seeks money damages, the defendants would be entitled to an

affirmance on this alternative ground. See, e.g., Garside, 895 

F.2d at 48-49 (explaining that a grant of summary judgment can be

affirmed on any independently sufficient ground made manifest in

the record). We elaborate below.

"In analyzing a claim of qualified immunity, . . . we

are concerned with clearly established constitutional or 

statutory rights of which a reasonable officer would have known

at the time he took action." Crooker v. Metallo, 5 F.3d 583, 584 

(1st Cir. 1993) (emphasis supplied). When used in this context,

the phrase "clearly established" has a well-defined meaning. It

denotes that at the time the challenged conduct occurred the

contours of the right were sufficiently plain that a reasonably

prudent state actor would have realized not merely that his

conduct might be wrong, but that it violated a particular

constitutional right. See Anderson v. Creighton, 483 U.S. 635, 

640 (1987); Buenrostro v. Collazo, 973 F.2d 39, 42 (1st Cir. 

1992). The inquiry into the nature of a constitutional right for

19

the purpose of ascertaining clear establishment seeks to discover

whether the right was reasonably well settled at the time of the

challenged conduct and whether the manner in which the right

related to the conduct was apparent. See Wiley v. Doory, 14 F.3d 

993, 995 (4th Cir. 1994) (Powell, J., sitting by designation).

In mounting this inquiry, courts may neither require that state

actors faultlessly anticipate the future trajectory of the law,

see Crooker, 5 F.3d at 585 (noting that a state actor is not 

"expected to carry a crystal ball"), nor permit claims of

qualified immunity to turn on the eventual outcome of a hitherto

problematic constitutional analysis, see, e.g., Collins v. 

Marina-Martinez, 894 F.2d 474, 478 (1st Cir. 1990) (recognizing 

that "a plaintiff who is entitled to prevail on the merits is not

necessarily entitled to prevail on the issue of qualified

immunity"); accord Amsden v. Moran, 904 F.2d 748, 751-52 (1st 

Cir. 1990) (citing other cases), cert. denied, 498 U.S. 1041 

(1991).

Here, there can be no doubt that, at the moment the

maiming of Martinez materialized, legitimate questions abounded

as to whether the conduct at issue violated Martinez'

constitutional rights. After all, DeShaney had not yet been 

decided; thus, the whole question of a constitutional duty to

intervene was cloaked in uncertainty. Even now, with the

guidance furnished by the DeShaney Court, the precise contours of 

the rule as it applies to onlooker officers are murky.

Consequently, even if Martinez had some basis for a claim that

20

the defendants owed him a duty grounded in the Constitution, the

dimensions of the right were dimly perceived (if perceived at

all). It follows inexorably that the defendants would be

entitled to qualified immunity and, hence, entitled to brevis 

disposition.

D. Other Theories. D. Other Theories. 

In addition to his principal due process claim,

Martinez advances several other theories. All are unavailing.

We mention three of them (rejecting the remainder without further

elaboration).

1. Violation of Local Law. Martinez urges that the 1. Violation of Local Law. 

defendants' breach of a provision of Puerto Rico's Civil Code,

P.R. Laws Ann. tit. 25, 1003 (1980),7 furnishes a basis for

liability under 42 U.S.C. 1983. He is wrong.

It is established beyond peradventure that a state

actor's failure to observe a duty imposed by state law, standing

alone, is not a sufficient foundation on which to erect a section

1983 claim. See, e.g., Amsden, 904 F.2d at 757; Chongris, 811 

F.2d at 42-43. Although it is true that constitutional

significance may attach to certain interests created by state
 

7The statute provides in pertinent part that police officers
have a duty

to protect persons and property, to maintain
and keep the public order, to observe and
secure the utmost protection of the civil
rights of the citizens, to prevent . . .
crime and . . . enforce obedience to the laws
. . . .

P.R. Laws Ann. tit. 25, 1003 (1980).

21

law, see, e.g., Chongris, 811 F.2d at 43 (recognizing that 

"property rights, while protected by the federal Constitution,

are creatures of state law"), not every transgression of state

law does double duty as a constitutional violation. The

Constitution is a charter of carefully enumerated rights and

responsibilities, defining the relationship between the people

and a government of limited powers. Its scope and application

are necessarily determined by its own terms. Though grand in its

design and eloquent in its phrasing, the Constitution is not an

empty ledger awaiting the entry of an aggrieved litigant's

recitation of alleged state law violations no matter how

egregious those violations may appear within the local legal

framework.8

Moreover, while the plaintiff states that section 1003

creates a constitutionally protected "entitlement" under Board of 

Regents v. Roth, 408 U.S. 564, 576-77 (1972), he does not develop 

the thesis and we do not see how Roth applies. Neither Roth's 

focus nor its procedural design bears any similarity to the case

at hand. For one thing, the Roth Court's conception of a 

cognizable constitutional entitlement was limited to property

interests. See id. (citing Goldberg v. Kelly, 397 U.S. 254 

(1970)). We fail to intuit how Roth supports the plaintiff's 

 

8The absence of a constitutional duty to intervene in no way 
detracts from the callous nature of the conduct attributed to the
officers in this case, nor does it imply that onlooker officers
confronted by private violence may not have a state law duty to
intervene. That question, quite simply, lies beyond the borders
of this opinion.

22

claim that he had an entitlement, pursuant to section 1003, to be

protected in his physical person. For another thing, the

remedial framework contemplated by Roth procedural due process, 

principally in the form of notice and a hearing, see id. at 577  

has no applicability at all to Martinez' remonstrance. Whatever

other uncertainties may plague this case, it is clear that

Martinez is claiming a substantive due process violation, not a 

procedural due process violation. See, e.g., Amsden, 904 F.2d at 

753-54 (delineating differences).

In sum, Roth is a round hole, and Martinez' square peg 

of a case does not fit within it.

2. Equal Protection. The plaintiff makes the bold 2. Equal Protection. 

assertion that he was denied rights secured to him under the

Equal Protection Clause because, were he a private citizen, the

defendants would almost certainly have come to his rescue. He

does not embellish this ipse dixit in any way.9 Consequently, 

it does not assist his cause. "It is settled in this circuit

that issues adverted to on appeal in a perfunctory manner,

unaccompanied by some developed argumentation, are deemed to have

been abandoned." Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 

734 (1st Cir. 1990); accord United States v. Zannino, 895 F.2d 1, 
 

9This criticism rests neither on the economy of Martinez'
asseveration nor on its potential incoherence, but, rather, on
the utter lack of any legal foundation provided for the claim; 
Martinez makes reference to no constitutional provision, no
statute, no case law, no treatise, not even a law review article.
Parties to legal controversies must do more than allege
unsupported facts to survive summary judgment; they must at the
very least explain the basis for, and the legal significance of,
those facts.

23

17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990); Collins v. 

Marina-Martinez, 894 F.2d 474, 481 n.9 (1st Cir. 1990). So it is 

here: the plaintiff's fleeting reference to equal protection

does not succeed in preserving the issue for review.10

3. Supervisory Liability. Finally, the plaintiff 3. Supervisory Liability. 

maintains that Trinidad, if not liable under section 1983 as an

onlooker officer, may be held liable qua shift supervisor for 

Valentin's acts. "Supervisory liability attaches only if a

plaintiff can demonstrate by material of evidentiary quality an

affirmative link between the supervisor's conduct and the

underlying section 1983 violation." Maldonado-Denis v. Castillo- 

Rodriguez, 23 F.3d 576, 583 (1st Cir. 1994); see also Febus- 

Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994); 

Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 

1989). Because no underlying constitutional violation in fact

occurred, see supra Part III(C), no supervisory liability can be 

 

10To the extent that our dissenting colleague proposes that
the defendants' nonintervention cannot be deemed rational, see 
post at pp. 30-31, this is merely another way of disagreeing with
our conclusion that Valentin's conduct was private, not public.
As for the larger issue of drawing distinctions between the
private and the public, we note simply that such distinctions are
regularly and validly drawn by courts and legislatures alike.
See, e.g., Westlands Water Dist. v. Amoco Chem. Co., 953 F.2d 
1109, 1113 (9th Cir. 1991) (finding a rational basis for
distinguishing between public and private tortfeasors in regard
to recovery of punitive damages); Southern Cal. Edison Co. v. 
United States, 415 F.2d 758, 760 (9th Cir.) (noting that "under 
the equal protection clause the separate classification of
privately and publicly owned utilities has long been held
justifiable"), cert. denied, 396 U.S. 957 (1969). It is this 
very distinction public versus private that undergirds not
only DeShaney but also the Bill of Rights itself. 

24

attributed to Trinidad under section 1983.11

IV. CONCLUSION IV. CONCLUSION

We need go no further. Because the defendants' failure

to intervene and protect the plaintiff against Valentin's private

actions, though regrettable, cannot be said to have violated

rights secured to the plaintiff by the United States

Constitution, see DeShaney, 489 U.S. at 196-97, the district 

court did not err in summarily disposing of the federal claims.

And, once the court determined so far in advance of trial that no

legitimate federal question existed, the jurisdictional basis for

plaintiff's pendent claims under Puerto Rico law evaporated. See 

Brennan, 888 F.2d at 196. Thus, the court properly dismissed the 

balance of the complaint.12

Affirmed. Affirmed. 

Dissent follows 

 

11Moreover, Trinidad was not the supervisor on Valentin's
shift (during which Martinez was shot), but, rather, on the
subsequent 4:00 a.m. to 12 noon shift. Thus, it is far from
clear that supervisory liability would be a viable theory vis-a-
vis Trinidad even if an underlying constitutional violation could
be shown.

12Of course, the dismissal operates without prejudice to
whatever rights plaintiff may have to prosecute the pendent
claims in the courts of Puerto Rico. See Feinstein v. RTC, 942 
F.2d 34, 47 (1st Cir. 1991).

25

BOWNES, Senior Circuit Judge, dissenting. For the BOWNES, Senior Circuit Judge, 

reasons that follow, I cannot join the majority opinion. I

start with the facts. Although the majority's factual

recitation is not inaccurate, it is not a full-bodied

portrayal of what happened.

I. I.

Plaintiff, Martinez, was a young (age twenty) and

comparatively new member of the Puerto Rico Police Force. On

the day of the events giving rise to this case, he arrived at

the police station sufficiently early to be given his duty

assignment. Martinez parked his car in the police parking

lot. He got out of his car and started towards the police

station to get his orders for the day. There were four other

police officers in the lot: the defendants -- Colon, V lez

and Trinidad -- and Valentin, who is not a defendant. As the

majority acknowledges, the defendants were, at all relevant

times, on duty as police officers and acting under color of

state law. The three defendants observed the events that

took place in the parking lot and the police station and

heard Valentin's denigrating remarks to Martinez. None of

the defendants asked Valentin to stop his verbal and physical

assaults against Martinez. To put it starkly, they stood by

and watched without protest Valentin "blow away" Martinez's

penis.

26

As Martinez walked across the parking lot, Valentin

said to the defendants, "Here comes Pretty Boy." Valentin

then accosted Martinez, drew his service revolver, pointed it

directly at Martinez's genital area, cocked it, put his

finger on the trigger, asked Martinez if he was afraid, and

then lowered the revolver. Martinez told Valentin: "Don't

horse around with that because you will kill me." Martinez

then proceeded into the station house. A short time later

Valentin again confronted Martinez; this time he pushed his

finger through a hole in Martinez's undershirt and ripped the

shirt open. The record does not disclose whether any words

were spoken at this juncture. Martinez put his police

uniform on and reported to his shift supervisor, defendant

Trinidad.

A short time later Valentin again assaulted

Martinez. This assault was similar to the first

confrontation, but with an ominous threat. This time

Valentin pushed the muzzle of his loaded and cocked revolver

into the front of Martinez's pants and threatened to "blow

away" Martinez's penis. Valentin then asked Martinez if he

was scared. After Valentin withdrew the weapon, Martinez

moved away from him.

A short time later, within minutes, Valentin again

accosted Martinez. He loaded and cocked his revolver and

then inserted it into the front of Martinez's pants while

27

continuing to verbally abuse him. The charade ended when

Valentin's revolver discharged. Valentin's prior threat

became a reality; Martinez's penis was in fact blown away and

he was rendered permanently impotent.

The majority calls the shooting accidental and

says, "All parties agree that the shooting . . . was

unintentional." Ante at 4. Whether the shooting was 

accidental or not, it can be concluded, based on Valentin's

words and actions, that it was an accident that was bound to

happen. What Valentin did makes Russian roulette seem like a

parlor game.

II. II.

The majority's central holding is premised on a

ruling that Valentin was not acting under color of state law.

In my view, the facts taken in the light most favorable to

plaintiff establish that Valentin was acting under color of

state law. 

As the majority points out: "`[T]he traditional

definition of acting under color of state law requires that

the defendant have exercised power possessed by virtue of

state law and made possible only because the wrongdoer is

clothed with the authority of the state.'" Ante at 13 

(quoting West v. Atkins, 487 U.S. 42, 49 (1988)) (ellipses 

and internal quotation marks omitted). Simply stated, "a

person acts under color of state law `when he abuses the

28

position given him by the State.'" Id. (quoting West, 487 

U.S. at 50). I think that Valentin exercised power possessed

by virtue of Puerto Rico law and made possible only because

he was clothed with the authority of Puerto Rico, and that he

abused that power.

Even if I disregard the obvious -- that Valentin

was in uniform, on duty, in the police station, and used his

service revolver to commit the tort (all of which militate

heavily in favor of a finding that Valentin abused his

position as a police officer) -- I believe that Valentin's

status as a police officer was the only reason the defendants

took no action. If Valentin had been a private citizen and

had been tormenting Martinez in the same manner, the

bystander officers certainly would have intervened. The

record gives rise to a reasonable inference that Valentin's

police-officer status led the bystander officers to conclude

that: (1) Valentin was not mentally unbalanced to the point

that he might actually shoot Martinez, but a stable person

only engaged in harassment or horseplay; and (2) Valentin was

skilled enough with firearms to be allowed to engage in this

sort of stupidity. Consequently, the record gives rise to an

inference that Valentin's police-officer status was a sine 

qua non of the bystander officers' non-intervention. In my 

view, this inference establishes that Valentin was acting

under color of state law. 

29

The majority suggests that Martinez's status as a 

police officer somehow reduced the likelihood that Martinez

perceived Valentin to be acting with the imprimatur of the

Commonwealth. See id. at 17 n.6. I believe the opposite 

conclusion is at least as likely to be true. After the

bystander officers (including Trinidad, who had supervisory

authority) failed to intervene during the initial rounds of

abuse by Valentin, Martinez could well have concluded that

this type of hazing of young officers was standard fare in

the Loiza Street Precinct. Therefore, Martinez could well

have believed that the Commonwealth acquiesced in Valentin's

actions.

Because Valentin was acting under color of state

law, I think it pellucid that DeShaney does not bar this 

suit. At most, DeShaney precludes civil rights actions 

against state actors under the Due Process Clause for failing

to protect an individual against private violence. See 489 

U.S. at 197. The DeShaney majority took pains to distinguish 

the case before it from situations where the state itself,

through its own affirmative action prior to the complained-of

non-intervention, limited the victim's freedom. Id. at 198- 

201 (contrasting situations where the state has taken custody

of certain individuals and thereby incurred "some

responsibility for [their] safety and well-being"). Here,

the Commonwealth, acting through the person of Valentin,

30

compromised Martinez's freedom by successively assaulting him

three times with a loaded service revolver. See West, 487 

U.S. at 49. In my view, this infringement was more than

sufficient to support Martinez's substantive due process

claim. DeShaney, 489 U.S. at 200 ("In the substantive due 

process analysis, it is the State's affirmative act of

restraining the individual's freedom to act on his own behalf

-- through incarceration, institutionalization, or other

similar restraint of personal liberty -- which is the

`deprivation of liberty' triggering the protections of the

Due Process Clause."). 

I believe it important to comment on three discrete

parts of the majority opinion. The majority concedes that

Valentin's use of his service revolver might arguably bring

his actions within the color of state law. Ante at 16. This 

is then rejected on two grounds: that it was not raised in

the district court or plaintiff's appellate brief; and on the

merits. I cannot help but wonder why the straw man approach

was used. In any event, I disagree on both grounds.

Fairly construed, Martinez's argument that

Valentin's status as an on-duty police officer made him a

state actor incorporates the argument that Valentin used the

indicia and tools of his trade (including his service

revolver) to carry out the shooting. For me, this is more

than enough to allow us to consider Valentin's use of his

31

service revolver as a factor in determining whether he was a

state actor.

I am also am troubled by the majority's finding

that Martinez waived his equal protection claim. Id. at 22. 

As an initial matter, I think it important to state that the

claim appears to have some substance. How, after all, can it

be rational for bystander officers not to intervene simply

because one of their own -- as opposed to a civilian -- is

being victimized by violence? What legitimate state

objective could such inaction serve?

The majority finds that Martinez abandoned this

claim because he failed to "embellish" it sufficiently. Id. 

I do not think that the issue needed any embellishing. It

was called an equal protection claim and stated relatively

clearly: "If Wilfredo had been a private citizen, it seems

clear that defendants-appellees would have realized that they

were obliged under the law to protect him from the threat of

serious damages." Appellant's Brief at 9. In my view, this

was sufficient to put the claim in issue.

Finally, I think it important to refute the

majority's suggestion that Valentin might not have been

acting under color of state law even if Martinez had been a 

civilian. Ante at 17 n.6 ("Had Martinez been a civilian 

rather than a fellow officer, the significance of Valentin's

uniform and weapon for purposes of the color-of-law

32

determination might well have been greater.") (emphasis 

supplied). I find the suggestion remarkable. If a civilian

had suffered the abuse Martinez experienced at the hands of

an on-duty, uniformed police officer using his service 

revolver in front of other officers in a police station, 

well-settled precedent would dictate a finding that the

civilian was victimized under color of state law. We should

not even hint that this may not be so.

III. III.

I also cannot agree with the majority's conclusion

that an unargued qualified immunity theory provides an

alternative ground for affirmance in this case. See id. at 

18-20.

Under the qualified immunity doctrine, "government

officials performing discretionary functions[] generally are

shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In 

determining whether a right was "clearly established" at the

relevant point in time, courts must analyze it at the

appropriate level of specificity. Thus, a right is not

"clearly established" for qualified immunity purposes unless

its contours are sufficiently clear so "that a reasonable

33

official would understand that what he is doing violated that

right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). 

The majority suggests that Martinez's right to have

the bystander officers intervene on his behalf was "cloaked

in uncertainty" and was "murky" at the time of the relevant

events. I disagree. As the majority concedes, it was

settled at the time of the events in this case that 

[a]n officer who is present at the scene
[of an arrest] and who fails to take
reasonable steps to protect the victim of
another officer's use of excessive force
can be held liable under section 1983 for
his nonfeasance, provided that he had a
realistic opportunity to prevent the
other officer's actions. 

Ante at 9 (citations and internal quotation marks omitted). 

In my view, this line of authority controls here. 

The majority distinguishes this precedent by

suggesting that it is inapplicable where the tortfeasor

officer is not acting under the color of state law, and then

concludes that Valentin was not so acting here. For the

reasons I have explained above (and despite the opinion of my

esteemed colleagues), I do not think that an objectively

reasonable police officer could have seen Valentin's actions

as purely private. And because Valentin was acting under the

color of state law, the aforementioned authority was

sufficient to have informed defendants of their obligation to

intervene on Martinez's behalf. See Anderson, 483 U.S. at 

640 ("This is not to say that an official action is protected

34

by qualified immunity unless the very action in question has

previously been held unlawful, but it is to say that in the

light of pre-existing law the unlawfulness must be

apparent.") (citation omitted). If excessive force during

the course of a lawful arrest requires intervention, so too

should an assault with a deadly weapon taking place during

the course of an entirely unlawful seizure. I therefore 

disagree with the majority's qualified immunity analysis.

IV. IV.

Police officers are entrusted with great powers --

including the privileged use of force -- for the very purpose

of preventing lawless violence. When an officer abuses those

powers in front of his peers, he in effect presumes their

tacit acquiescence, if not outright approval. In this

situation, the other officers have a constitutional duty to

intervene. I therefore respectfully dissent.

35